UNITED STATES of America, Plaintiff-Appellant,

v.

Michael GILBERT, Defendant-Appellee,

Karen Gilbert, Michael Gilbert Family Irrevocable Trust, Third Party Claimants-Appellees.

No. 97-4578.

United States Court of Appeals,

Eleventh Circuit.

March 16, 2001.

Appeal from the United States District Court for the Southern District of Florida.(No. 89-00879-CR-NCR), Norman C. Roettger, Jr., Judge.

Before TJOFLAT, EDMONDSON and KRAVITCH, Circuit Judges.

TJOFLAT, Circuit Judge:

This appeal represents the latest—and we hope final—chapter in a protracted RICO prosecution which has already commanded the attention of four panels of this court.[1] Following our 1996 mandate setting aside the criminal forfeiture of Michael Gilbert's interest in a California limited partnership, the Government moved the district court to force Michael Gilbert and his family[2] to file third-party petitions to reclaim their interests pursuant to 18 U.S.C. § 1963(*l*), and to restrain the Gilberts from the use and enjoyment of the previously forfeited property pending the outcome of the section 1963(*l*) hearing. The Government contends that although the judgment forfeiting Michael Gilbert's partnership interest has been set aside, the Gilberts should be forced to file third-party petitions because Michael derived his partnership interest as a subsequent transferee of Benjamin Kramer, one of his co-defendants whose silent interest in the limited partnership remains forfeited to the United States.

We conclude that the district court did not abuse its discretion in denying the Government's request. The statutory scheme outlined in section 1963(*l*) does not permit the Government's attempt to force the Gilberts to file third-party petitions. Moreover, we note that even if section 1963(*l*) did allow such an action

---

[1]*See United States v. Kramer,* 864 F.2d 99 (11th Cir.1988) (non-argument calendar); *United States v. Kramer,* 912 F.2d 1257 (11th Cir.1990); *United States v. Kramer,* 73 F.3d 1067 (11th Cir.1996); and the instant appeal.

[2]We refer to Michael Gilbert, his wife Karen Gilbert, and the Michael Gilbert Family Irrevocable Trust (the "Trust") collectively as the Gilberts. We refer to them by their first names or simply as the Trust to designate them individually.

by the Government, the subsequent proceeding would be needless because the order of forfeiture upon which

the Government relies is invalid. Accordingly, we affirm the district court's denial of the Government's

motion to force the Gilberts to file third-party petitions pursuant to 18 U.S.C. § 1963(*l* ) and to restrain the

Gilberts from the use and enjoyment of their property.

## I.

## A.

The Bell Gardens Bicycle Club (the "Club") was created on December 5, 1983[3] as a joint venture

between two California partnerships: LCP, a general partnership,[4] and Park Place Associates, a limited

partnership ("PPA").[5] PPA had received an exclusive license from the City of Bell Gardens to operate a card

club in 1982, but was unable at that time to raise enough money to buy land and begin construction. PPA

thus entered into a joint venture agreement with LCP, which offered to find the funds necessary to finance

the Club's construction. For its part, PPA agreed to contribute its rights to property in the City of Bell

---

[3]The history of the case recited herein is a summary of the records from both the criminal RICO proceedings, *see supra* n. 1, and the ancillary proceedings that followed the criminal trial, in which the court adjudicated third-party claims to the defendants' forfeited property. *See infra,* Part I.E.

[4]LCP was a general partnership from its creation on December 5, 1983 until its reorganization as a limited partnership, "LCP Associates, Ltd.," on November 15, 1984. For the sake of simplicity, we refer to the limited partnership as "LCP, Ltd."

[5]The Club has been described as:

> the world's largest card club. It is located in a 100,000 square foot building on an 8.5 acre parcel in the City of Bell Gardens, California. The [Club] does not generate revenue by participating in the card games it houses. Instead, the Club rents space to card players for an hourly fee, providing the assistance of expert dealers. The Club is open 24 hours a day, 365 days a year, and employs more than 1800 persons. In 1990, it was generating after-tax profits of $23 million per year and was estimated to be worth $150 million. Taxation of the Club is the primary source of revenue for the City of Bell Gardens.

Michael S. Pasano, *The Saga of the Bell Gardens Bicycle Club—Lessons and Nightmares,* 1998 ABA Center for Ctr. for Continuing Legal Educ. Nat'l Inst. Sec.Crim. Just. [hereinafter "The Saga"]. We note that the author, Mr. Pasano, is co-counsel representing the Gilbert family interests in this appeal.

In 1990, the Government took over the Club after a jury forfeited it to the Government as proceeds of racketeering activity. The Government has faired little better than the previous owners in purging the stain of corruption and scandal surrounding the Club. *See* Sharon Walsh, *Crime Alleged at Casino U.S. Partly Owns,* Wash. Post, Mar. 20, 1996, at D3; *see also* James Bornemeier, *U.S.Owned Casino Overrun by Crime, Security Chief Alleges,* L.A. Times, Mar. 20, 1996, at B3.

Gardens as well as the gaming license it had already obtained.[6]

Unbeknownst to PPA, one source of funding located by LCP was a large-scale money laundering operation.[7] From 1982 to 1987, Benjamin Kramer and three of his partners (Randy Lanier, George Brock, and Gene Fisher) were involved in an intricate scheme to import large quantities of marijuana into the United States. *See United States v. Kramer,* 73 F.3d 1067, 1070 (11th Cir.1996); *United States v. Kramer,* 807 F.Supp. 707, 710 (S.D.Fla.1991); *see also United States v. Kramer,* 955 F.2d 479 (7th Cir.1992). The details of this bold undertaking and the elaborate money laundering operation that followed are described in great detail in *Kramer,* 807 F.Supp. at 710-736. Of significance in the instant appeal is that approximately $12.6 million of the initial $22 million needed to build the Club came from proceeds of Kramer's marijuana smuggling operation.[8]

The level of complicity in the money laundering plan varied among the LCP partners. The three original LCP partners—Dale Lyon, Julie Coyne, and David Pierson—were brought together in 1983 by Michael Gilbert's father, Sam Gilbert. Sam, a wealthy Los Angeles businessman, was the first Gilbert to establish ties with the Kramer family when he befriended Benjamin Kramer's father, Jack Kramer, in 1978. At that time, Jack Kramer and Sam Gilbert came up with the idea of building a legal card club for the purposes of laundering Benjamin Kramer's dirty money. By 1983, Sam Gilbert was in contact with David Pierson, who was himself thinking of building a card club and was looking for legitimate investors. Pierson gave Sam Gilbert a prospectus, Sam liked what he saw, and Sam agreed to arrange the financing for the project in return for a sixty percent share of Pierson's ownership interest in the Club.

Sam Gilbert went to work putting together a team to undertake the financing side of the project. To that end, Sam Gilbert brought in Dale Lyon, a banker and businessman, and Julie Coyne, who had an experienced background in personnel. For some time, Lyon, Pierson, Coyne, and Sam Gilbert discussed the ownership percentages of what would become the LCP general partnership. Then, for little or no

---

[6]The Joint Venture Agreement provided for the following profit distribution: 70% to LCP and 30% to PPA until the Club's loan was paid off, and then the figures were to be 60% to LCP and 40% to PPA. Additionally, there was a provision stating that when the Club's profits reached six million dollars, the split was to be 65/35 in favor of LCP. This six million dollar threshold has been reached, but the record does not indicate when this happened.

[7]PPA was unaware of the money laundering scheme and has been cleared of any wrongdoing. *See United States v. Kramer,* 807 F.Supp. 707, 736 (S.D.Fla.1991).

[8]The rest of the Club's financing was obtained through legitimate lending institutions.

consideration, Sam Gilbert gave his entire sixty percent interest in LCP to the newcomers Lyon and Coyne in equal shares.[9] At the end of the day, Lyon and Coyne each owned a thirty percent interest in LCP and Pierson controlled the other forty percent interest.

While Sam Gilbert, Lyon, Coyne, and Pierson were negotiating their respective interests in LCP, Coyne, Sam Gilbert, and Lyon set up CGL Investment Company, Inc. ("CGL"). CGL was created to pose as a legitimate mortgage broker that would fund and invest in real estate projects, specifically, the Club. Shortly after Sam Gilbert had taken the necessary steps to organize both LCP and CGL, he met with Jack Kramer to explain the money laundering scheme, referring at that time to the new LCP partners and PPA as "your straw people. [The] lily-white people who will be approved by the Gambling Commission." *Kramer,* 807 F.Supp. at 712-13.

Approximately $12.6 million of Benjamin Kramer and his three associates' drug money was sent to CGL from a sham lending firm named Troon Mortgage Investment company ("Troon"), located in Tortola, which is part of the British Virgin Islands. Troon received the drug money from a trust called the BRT trust, located in Liechtenstein.[10] Sam Gilbert arranged for the money to be sent from Troon to CGL in the form of a loan. CGL then forwarded the money to the Club, once again in the form of a loan. In appreciation for the loan, Sam Gilbert promised Benjamin and Jack Kramer that they would retain their lender's rights of repayment of principal at a fifteen percent rate of interest (payable over fifteen years). In addition, Troon was to receive a fifteen percent income participation "kicker" payable over the life of the project.

With the necessary funds in hand, construction on the Club began in January 1984. By the fall of the same year, however, it became obvious that an additional $10 million would be needed to finish the project. To this aim, the LCP general partners asked Sam Gilbert to personally guarantee a $5 million loan

[9]When Sam Gilbert was not laundering drug money for Benjamin Kramer, Sam owned and operated a construction company. The best explanation for why Sam agreed so readily to give up his majority interest in what was to become LCP was that Pierson, Lyon, and Coyne all agreed that Sam's construction company would build the Club and that Sam would receive a 10% fixed-fee contract. According to testimony at trial, Sam thought the casino card club business was too risky a venture and he was content simply making his money by building the Club.

[10]Following the criminal RICO trial, the district court held ancillary proceedings to determine issues of ownership in the property forfeited to the Government. *See infra* Part I.E. According to the district court's findings following the ancillary proceedings, the three letters that form the BRT name stand for Ben, Randy, and Tom—the first names of the drug smuggling partners: Ben Kramer, Randy Lanier, and George Brock (who was also known as Tom). *See Kramer,* 807 F.Supp. at 736. The district court also found that the first flow of money from Liechtenstein to Troon was on January 29, 1984, which coincides with the time construction on the club began. *See id.* at 713.

that LCP had negotiated from a legitimate lending institution. Sam Gilbert refused to provide this guarantee but indicated that his son, Michael Gilbert, might be interested.[11] Sam Gilbert told Michael of LCP's need for additional financing and informed him that a twenty percent interest in LCP was available for $200,000. Michael Gilbert, in turn, discussed this opportunity with his siblings, Robert and Margaret. In November 1984, after some negotiations with the LCP partners, Michael, Robert, and Margaret bought a twenty percent interest in LCP in exchange for $200,000 and an agreement to guarantee a $5.5 million loan to help finish construction of the Club. Coyne and Pierson each gave up ten percent of their interest in LCP to carve out the twenty percent share.[12]

Gilbert and his siblings obtained a $200,000 loan from the Olympic National Bank to purchase the twenty percent interest in LCP. By agreement of the parties, LCP, rather than Michael Gilbert or his siblings, made the interest payments on the loan, and the loan principal was paid directly out of Michael Gilbert's and his siblings' profit distributions. As a result of Michael, Robert, and Margaret buying this twenty percent ownership interest, LCP, which had from its inception been organized as a general partnership, was reorganized into a limited partnership ("LCP, Ltd.") on November 15, 1984.[13]

The newly acquired twenty percent interest in LCP, Ltd. was divided among the members of the Gilbert family as follows: Michael and Robert each received one-third (or 6.67% each) and the remaining one-third was divided equally among Margaret, Michael's three children, and Robert's four children. Both

---

[11]Michael Gilbert was involved with the Club even before he was approached by the LCP partners. As the president of his father's construction company, he supervised the Club's construction.

[12]According to both Coyne's and Pierson's testimony during the ancillary hearing following the criminal trial, they each gave up ten percent of their ownership interest in LCP because it made sense to give up a little and see the Club open, rather than have a larger ownership interest in an unfinished construction project.

[13]The Limited Partnership Agreement, which was not introduced into evidence at trial, provides that "[t]he General Partners shall cause to be executed and shall execute an amendment to the JOINT VENTURE AGREEMENT reflecting the conversion of [LCP] into a Limited Partnership." In a letter submitted to this court at our request, however, the Government informs us that it was "unable to locate or identify any documentary or testimonial evidence presented in either the criminal trial or the ancillary forfeiture proceeding ... showing that the December 5, 1983 Joint Venture Agreement between LCP Associates and Park Place Associates was ever formally amended to substitute LCP Associates Ltd. (the limited partnership) for LCP Associates (the general partnership)." Thus, we question whether there was ever a novation in the Joint Venture Agreement whereby LCP, Ltd. assumed the rights and/or obligations of the LCP general partnership as a member of the Bell Gardens Bicycle Club Joint Venture. *See* Restatement (Second) of Contracts § 280 (1979) (explaining that a novation substitutes a new party and discharges one of the original parties to a contract by agreement of all three parties; a new contract is created with the same terms as the original one, but the parties are changed).

Michael and Robert placed their children's shares in trust by creating, respectively, the Michael Gilbert Family Irrevocable Trust (the "Trust") and the Robert Gilbert Family Irrevocable Trust. In total, Michael Gilbert and the Trust owned approximately a ten percent interest (9.1675%) in LCP, Ltd.

The Club opened for business on November 30, 1984. Although the Club was not immediately successful, it started turning a substantial profit within six months. In 1989, the Club's after-tax profits were approximately $23 million. Starting in December 1984, the Club made regular mortgage payments on the CGL loan. LCP, Ltd. also paid CGL its fifteen percent profit participation on a monthly basis. In turn, CGL forwarded the mortgage payments and the kicker to Troon.[14]

In 1986, the net quickly closed in on Benjamin Kramer's money laundering operation. Benjamin Kramer's contact in Tortola who ran Troon was arrested by British police. Shortly after the arrest, the Drug Enforcement Administration ("DEA") obtained Troon's records and launched a joint investigation with the Internal Revenue Service into the Club's financing. In November 1986, DEA agents interviewed Sam Gilbert, Michael Gilbert, and others as part of an investigation into the possible use of drug proceeds to build the Club.

Compounding Benjamin Kramer's woes was the fact that the Club was now turning a substantial profit and, as Jack Kramer testified during the ancillary hearing following the criminal trial, "the Devil raised his head" and Sam Gilbert decided to make the Kramer interest in the Club disappear. *Kramer,* 807 F.Supp. at 731. Sam Gilbert swiftly forced Benjamin Kramer out by reneging on the fifteen percent kicker and then refinancing the balance due on the $12.6 million mortgage loan at a more favorable interest rate through a legitimate lending institution. Forcing Benjamin Kramer out was easily accomplished, since his name had been intentionally left off of all Club documents to hide his illegitimate ownership interest. At the same time the $12.6 million loan was being refinanced, Michael Gilbert and Lyon, at a CGL Board of Director's meeting,[15] authorized the transfer of $9.5 million in the form of a cashier's check as repayment of CGL's obligation to Troon.[16] The Government later traced the $9.5 million transfer to a Bank account in

---

[14]By mid-1985, CGL had apparently sent Troon $860,000 in repayment on the loan.

[15]Michael Gilbert became involved with CGL when he accepted a position as Vice-President in June or July 1985.

[16]The $9.5 million was apparently transferred to Lyon's bank, The Bank of Beverly Hills, converted to a cashier's check, deposited into a Swiss bank account and later transferred to Luxembourg.

Luxembourg.[17]

B.

On November 24, 1987, a Southern District of Florida grand jury returned an indictment charging Benjamin Kramer, Jack Kramer, Michael Gilbert, and Melvin Kessler (an attorney who is of no conse- quence to this appeal), with various vio- lations of the RICO statute,[18] the Travel Act,[19] and conspiracy to defraud the Internal Revenue Service.[20] Specifically, the RICO count alleged that the defendants had been engaged in a scheme to launder money generated from trafficking marijuana.

The indictment also included a RICO forfeiture count in which the Government alleged that all four of the defendants had "property constituting, and derived from, proceeds which they obtained, directly or indirectly, from racketeering activity ... thereby making such property and the entire interest of the

[17]Although the Government put on no evidence to explain what happened to this $9.5 million, Jack Kramer testified during the ancillary hearing following the criminal proceeding that the money was divided among Benjamin Kramer and his drug smuggling partners.

[18]RICO is an acronym for the Racketeer Influenced and Corrupt Organizations Act. *See* 18 U.S.C. §§ 1961-68 (1994). The "prohibited activities" section of RICO states:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce....

> (b) It shall be unlawful for any person through a pattern of racketeering activity or though collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962.

[19]The Travel Act prohibits the interstate travel or transportation in furtherance of a racketeering enterprise. 18 U.S.C. § 1952 (1994).

[20]On December 13, 1988, a superseding indictment was returned. Sam Gilbert was named in the original indictment but died in November 1987, and the indictment against him was dismissed. *Kramer,* 807 F.Supp. at 709.

defendants, therein or an amount of cash equivalent thereto including but not limited to the amount of $50,000,000.00, forfeitable to the United States pursuant to Title 18, United States Code, Section 1963(a)(3)." Next, the forfeiture count explained that "the said $50,000,000.00 constituting, and derived from, such proceeds includes but is not limited to the property described as" the Club. A legal description of the Club as set forth in the title document followed.[21]

## C.

On March 28, 1990, following a three month trial, the jury found Benjamin Kramer and Jack Kramer guilty of, *inter alia,* conspiring to racketeer under 18 U.S.C. § 1962(d) and of committing substantive racketeering acts under 18 U.S.C. § 1962(c). After having some difficulty arriving at a unanimous decision, the jury, two days later, found Michael Gilbert guilty of three counts of violating the Travel Act, 18 U.S.C. § 1952, and one count of racketeering under 18 U.S.C. § 1962(c).[22] *Kramer,* 73 F.3d at 1070.

## D.

Following these convictions, on April 2, 1990, the same jury considered the forfeiture issue in a separate proceeding. At the outset of the forfeiture phase, the Government called one witness, the Club's chief financial officer, through whom it introduced charts illustrating the origins of the various monies that went into building the Club as well as the Club's profit distributions. A slice taking up slightly more than half of one pie chart reflected the infusion of mortgage money originating from Troon and passing through CGL. The Government rested and closing arguments ensued.

Michael Gilbert was the only defendant who argued against forfeiture of the Club. Benjamin Kramer and Jack Kramer, through their counsel, informed the jury in their respective closing arguments that they did not have, and for that matter never had, an ownership interest in the Club. In fact, to stress this point, Benjamin Kramer's attorney openly invited the Government to enter into a stipulation whereby it could have

---

[21]Specifically, this portion of the indictment reads in relevant part: "THE BELL GARDENS BICYCLE CLUB, 7301 Eastern Avenue, Bell Gardens, California, a card club casino, consisting of a commercial building and three parcels of real property located within the city of Bell Gardens, California, of the following legal description...." The legal description of the three parcels followed. Nowhere in the indictment is mention made of the Club's contents, the Club's profit distributions or current valuation, the Club's owners and their respective ownership interests, LCP, Ltd., PPA, or CGL, or whether the $50 million mentioned in the indictment was intended as a substitute for forfeiting the Club.

[22]We take this opportunity to correct a misprint in our 1996 opinion which states that Michael Gilbert was convicted of "one count of violating the RICO statute, 18 U.S.C. § 1962(d)." *Kramer,* 73 F.3d at 1070. Michael Gilbert, in fact, was acquitted of the conspiracy charge under section 1962(d) but found guilty of the substantive RICO violation under section 1962(c).

whatever interest Benjamin Kramer had in the Club.[23]

In its closing argument on the forfeiture issue, the Government advanced its theory that "[t]he [Club] was built from the first shovel of dirt being taken out of the ground with drug money that came from Ben Kramer's marijuana smuggling. It was forfeitable from that very point forward." The Government further argued that forfeiture of the entire Club was proper and that the jury "ought not be concerned with ... the innocent people here ... [because] those individuals [could later] petition the court to get back any interest that they have" in the Club. In addition to the Club, the Government sought forfeiture of $9.5 million representing the amount wired from LCP, Ltd. to Troon in 1986.[24]

Following closing arguments on the forfeiture issue, the court instructed the jury that "the term 'forfeiture' means to be divested or deprived of the ownership of something as penalty for the commission of a crime." The court then explained that "to be entitled to such forfeiture, the Government must have proved beyond a reasonable doubt ... [t]hat the proceeds or property forfeited was obtained, directly or indirectly, by the Defendant, as charged; and ... [t]hat such proceeds or property were obtained by the specified Defendant ... from ... racketeering activity." Before it sent the jury out to deliberate, the court gave the jury special verdict of forfeiture forms to complete for each defendant.

The special verdict of forfeiture forms asked the jury whether the Club "constituted or was derived from any proceeds which [the named defendant] obtained directly or indirectly from racketeering activity." If the jury answered "yes" to that question, it then had to "indicate whether the [Club] is subject to Forfeiture." The jury answered "yes" to both questions on the verdict forms pertaining to Benjamin and Jack Kramer. In addition, the jury forfeited the $9.5 million that LCP, Ltd. sent to Troon in 1986, and held Benjamin and Jack

---

[23]Shortly before this trial in Florida, a jury in the Southern District of Illinois found Benjamin Kramer guilty of conspiring to distribute marijuana and of participating in a continuing criminal enterprise. The district court sentenced him to life in prison without the possibility of parole and a separate, concurrent forty-year term of imprisonment. In addition, the Illinois jury returned a $60 million forfeiture verdict against Benjamin Kramer. *See generally United States v. Kramer,* 955 F.2d 479, 481-82 (7th Cir.1992) (affirming his convictions and sentences). Given Benjamin Kramer's future prospects in the federal penitentiary and the rather large outstanding forfeiture judgment against him in Illinois, one can appreciate why the federal prosecutor in Florida elected to go after a piece of real property in California rather than settle for yet another large (but sure to be symbolic) money judgment. Randy Lanier and Gene Fisher, two of Benjamin Kramer's drug smuggling associates, were defendants in the Illinois trial and were also found guilty and sentenced to life imprisonment without the possibility of parole. George Brock (a/k/a Tom) was also indicted in Illinois but did not stand trial because he became a fugitive from justice. *Kramer,* 955 F.2d at 483 n. 2.

[24]The Government also asked the jury to forfeit $280,000, which represented monies that passed through Mel Kessler's trust account. The jury held the Kramers and Kessler jointly and severally liable for $280,000.

Kramer jointly and severally liable for that amount.[25]  With respect to Michael Gilbert, the jury struggled to come to a consensus on its forfeiture verdict pertaining to the Club.[26] The following day, the jury ultimately answered "yes" to both questions.[27]

Notably, the jury was never asked to delineate the extent of either Michael Gilbert's, Benjamin Kramer's, or Jack Kramer's ownership interest in the Club. For that matter, the jury was never asked to decide whether the Kramers even *had* an ownership interest in the Club. Over objection, the court disregarded Michael Gilbert's proposed special verdict forms and instructions that addressed both of these concerns.

E.

On April 3, 1990, at an impromptu hearing convened by the district court a few hours after the jury agreed to forfeit Michael Gilbert's interest in the Club, the prosecutor handed the court and those non-defendant parties interested in the Club who were then present a "motion for order of forfeiture and for order of seizure, entry of restraining orders and appointment of interim trustee."  The interested parties—persons asserting legitimate ownership interests in the now-forfeited Club—hurriedly entered objections, but "the district court entered the government's proposed order for forfeiture, and also seized the Club in its entirety, appointed an interim trustee, and prevented the Club or its owners from distributing

---

[25]The special verdict of forfeiture form pertaining to the $9.5 million read:  "Do you find beyond a reasonable doubt that the Nine and one Half (9.5) million dollars, or any portion thereof, is subject to forfeiture as to [the named defendant]?  If the answer above is yes, how much was so proved?"

[26]The jury did not mark a simple "yes" or "no" on Michael Gilbert's verdict form.  The jury found that the Club was proceeds of racketeering but that, with respect the Michael Gilbert, the Club was only forfeitable "as to the portion attributable to the CGL loans and Michael Gilbert [sic] ownership in the [Club] via CGL Investments."  The court, *sua sponte,* expressed concern that the jury's answer was unclear;  the Government and Michael Gilbert's attorney disagreed as to the significance of the jury's qualification.  The court sent the jury back to deliberate further.  After a short while, the jury sent the court the following note:  "Yes, subject to forfeiture as to any and all interest in the [Club] which Michael Gilbert obtained from his ownership in CGL Investments, and [Club] profit participation in CGL Investments."  This response, too, was deemed unacceptable, so the court sent the jury home for the night and summoned them to return in the morning.  The next morning, the jury continued its deliberation and shortly thereafter came back with a simple "yes" to the second question on the verdict form.  Over a defense objection, the court accepted the verdict and excused the jury.

[27]In 1993, Michael Gilbert was tried and convicted in the Southern District of Florida for money laundering as well as obstruction of justice and perjury based on his testimony in the 1990 RICO criminal trial, *Kramer,* 73 F.3d at 1070, and he was sentenced on August 27, 1993 to twenty-three years in prison. In January 1996, we reversed Gilbert's money laundering conviction.  *Id.* at 1072-73.  According to Michael Gilbert's attorney, after having served approximately sixty-three months in jail, Michael Gilbert was released in February 1996.  *See The Saga, supra* note 5.

profits or transferring their interests." *Kramer,* 912 F.2d at 1259.[28]

On or about April 27, the interested parties petitioned the district court[29] for an ancillary hearing pursuant to 18 U.S.C. § 1963(*l* )(2), which states that "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may ... petition the court for a hearing to adjudicate the validity of his alleged interest in the property."[30] The parties also asked the court for relief from or stay of the restraining orders previously placed on the Club. *Kramer,* 912 F.2d at 1259. Without addressing the merits of the third-parties' ownership claims, the district court "maintained the restraining order, pending final resolution of the scope of the forfeiture of the Club in a hearing required under 18 U.S.C. § 1963(*l* )." *Id.*

Despite the requirement that "[t]he hearing on the petition shall, to the extent practicable and consistent with the interests of justice, be held within *thirty days* of the filing of the petition," 18 U.S.C. § 1963(*l* )(4) (emphasis added), the district court's promise of an ancillary hearing went unfulfilled for the next

---

[28]The power to arrive at this rather dramatic result is found in 18 U.S.C. § 1963(e). At the time of the trial and ancillary proceedings, this provision read:

> Upon conviction of a person under this section, the court shall enter a judgment of forfeiture of the property to the United States and shall also authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court shall deem proper. Following an entry of an order declaring the property forfeited, the court may, upon application of the United States, enter such appropriate restraining orders or injunctions, require the execution of satisfactory performance bonds, appoint receivers, conservators, appraisers, accountants, or trustees, or take any other action to protect the interest of the United States in the property ordered forfeited.

[29]Michael Gilbert was among the parties who filed verified petitions.

[30]To defeat the government's entitlement to the forfeited property, a third-party must establish by a preponderance of the evidence that:

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

> the court shall amend the order of forfeiture in accordance with its determination.

18 U.S.C. § 1963(*l* )(6). If the third-party successfully establishes one of these two grounds, the forfeiture order must be amended to reflect the third-party's legitimate ownership interest in the property. 18 U.S.C. § 1963(*l* )(6).

four months. *Kramer,* 912 F.2d at 1257, 1259. In light of the district court's failure to comply with the statutory mandate, the LCP, Ltd. partners who claimed a legal interest in the Club[31] appealed on an expedited basis to this court for relief.[32] *See Kramer,* 912 F.2d. at 1258. PPA did not join in the appeal, presumably because "the government quickly relinquished any opposition to [PPA's] claim because of its non-involvement in money laundering." *Kramer,* 807 F.Supp. at 710.[33] On September 7, 1990, this court

---

[31]In a footnote, this court set out those claiming an interest in the Club by virtue of their ownership in LCP, Ltd. The court also set out their respective LCP, Ltd. ownership interests. Those claiming an interest were:

> a) M. Dale Lyon—28% owner and general partner of LCP.
>
> b) The Lyon Children Trust—2% owner and limited partner of LCP.
>
> c) David C. Pierson—30% owner and general partner of LCP.
>
> d) Lois J. Pierson—former spouse of David Pierson and owns one-half of his interest in LCP under California community property law.
>
> e) Julieann Coyne Wasson—20% owner and limited partner of LCP.
>
> f) Christopher Wasson—spouse of Julieann Coyne Wasson and owns one-half of her interest in LCP under California community property law.
>
> g) Michael Gilbert—only member of appellants that was a defendant at trial; 6.67% owner and limited partner of LCP.
>
> h) Karen Gilbert—spouse of Michael Gilbert and owns one-half of his interest in LCP under California community property law.
>
> i) Robert Gilbert—6.67% owner and limited partner of LCP.
>
> j) Margaret Gilbert—.8325% owner and limited partner of LCP.
>
> k) The Michael Gilbert Family Irrevocable Trust—2.4975% owner and limited partner of LCP.
>
> l) The Robert Gilbert Family Irrevocable Trust—3.33% owner and limited partner of LCP.

*Kramer,* 912 F.2d at 1258 n. 2.

[32]Michael Gilbert joined the appeal "as a means of preserving his rights in the event the district court grant[ed] his pending motion to set aside the forfeiture verdict against him."

[33]On May 23, 1990, the district court, in accordance with the Government's stipulation with PPA, permitted the PPA partners to receive their monthly profit distributions. On September 13, 1990, the court accepted a stipulated release of PPA's 35% ownership interest in the Club on the ground that PPA was an innocent owner under 18 U.S.C. § 1963(*l*). On July 9, 1990, the Government entered a stipulation with Sanwa Bank, one of the Club's legitimate mortgage lenders, whereby it agreed that "Sanwa has a valid and legitimate interest in the real and personal property of the Club, is an innocent person within the meaning of 18 U.S.C. § 1963, is a bona fide purchaser for value of its interest ... and

concluded that the district court had "erred by not holding a hearing required by § 1963(*l* ) within the statutory thirty day period after the filing of the claimants' petitions or a reasonable time thereafter," *Kramer,* 912 F.2d at 1260, and directed the district court to commence ancillary hearings within thirty days.

The ancillary hearings began on September 10, 1990. Michael Gilbert, through his attorney, argued that he should be allowed to participate in the proceedings and show that he was a bona fide purchaser of his interest in the Club. The Government opposed the motion, pointing out that section 1963(*l* )(2) states that *only* persons "*other than the defendant* ... may ... petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 18 U.S.C. § 1963(*l* )(2) (emphasis added). The court agreed, and summarily barred Michael Gilbert from participating in the ancillary proceedings.

On September 28, 1990, the district court continued the ancillary proceeding to allow the Government and the third-parties to engage in settlement discussions. Both Coyne and Pierson, among others, settled with the Government.[34] As a result, Lyon was the only founding LCP partner to participate in the ancillary proceeding through its conclusion. Joining him were the Lyon Family Trust, Karen Gilbert, and the Trust.[35]

In a lengthy Amended Final Order of Forfeiture dated July 22, 1991, the district court found that the "real owners" of the Club at its inception were Benjamin Kramer and his three drug smuggling associates (Randy Lanier, George Brock, and Brock's half-partner, Gene Fisher)—Benjamin Kramer was not the sole owner since he only contributed approximately $4 million (or 1/3) of the initial $12.6 million mortgage proceeds used to build the Club. *Kramer,* 807 F.Supp. at 736. In making this finding, the district court leaned heavily on the fact that "[f]rom the evidence the [Club] is adequately capitalized if Ben [Kramer] and partners are the real owners, but not so if Ben's money was found to be only a loan." *Id.* at 725. In light of the Club's negative asset structure (if the drug proceeds are ignored), the district court found that the LCP, Ltd. and PPA

---

was at the time of purchase reasonably without cause to believe that the Club[ ] ... was subject to forfeiture under 18 U.S.C. § 1963."

[34]Pierson, Pierson's wife, Lyon's wife, Coyne, Coyne's husband, Robert Gilbert, Margaret Gilbert, and the Robert Gilbert Family Irrevocable Trust settled with the Government. The terms of the settlement were not disclosed to the district court before the ancillary hearing for fear that they might influence the court's decision.

[35]Christine Kramer, the former wife of Benjamin Kramer, also tried to establish that she was the legitimate owner of one-half of her ex-husband's interest in the Club. The court denied her petition in its entirety. *Kramer,* 807 F.Supp. at 742-43.

partners[36] were merely straw persons whose purpose was to obtain the requisite licenses for a card club and make the Club look legitimate, *id.* at 736, and that the three original LCP general partners were nominees[37] for the investments of Benjamin Kramer and his three drug-smuggling associates. *Id.* at 739.

Faced with trying to delineate the extent of third-party Lyon's ownership interest in the Club, the court concluded that "[w]hatever interest Ben Kramer had at [the time he and his three drug-smuggling associates loaned approximately $12 million to LCP] precludes Lyon, under the relation back doctrine, from asserting either that title was vested in him rather than the Defendant Ben Kramer or that he was a title holder superior to Ben Kramer's interest." *Id.*[38] Because forfeiture under RICO reaches only the ownership interest held by the defendant (and Benjamin Kramer's three drug-smuggling associates had not been indicted), the district court denied "Lyon's petition in the amount of one-third (1/3) of his current holdings in LCP" since Benjamin Kramer's share of the invested drug proceeds was approximately $4 million of the total $12.6 million investment, or one-third. *Id.* The district court also concluded that Lyon was not a bona fide purchaser of that portion of his interest. *Id.* at 740.

Michael Gilbert's wife, Karen, also participated in the ancillary hearings. She claimed an interest in the Club by virtue of the fact that, as Michael Gilbert's wife, California community property laws entitled her

---

[36]The district court concluded that PPA as well as Robert and Margaret Gilbert were unaware of the money laundering scheme "but the others (LCP and Michael Gilbert) were involved heavily, or knew or should have known of the illicit nature of the operation. Julie Coyne and possibly David Pierson, too, may well fall into the latter category; whether they fit into any of the categories or were duped by Sam, et al., are questions this court does not have to decide." *Kramer,* 807 F.Supp. at 736.

[37]The term nominee refers to someone "designated to act for another as his representative in a rather limited sense." *Schuh Trading Co. v. Comm'r,* 95 F.2d 404, 411 (7th Cir.1938). "[N]ominee in its commonly accepted meaning connotes the delegation of authority to the nominee in a representative or nominal capacity only, and does not connote the transfer or assignment to the nominee of any property in or ownership of the rights of the person nominating him." *Ott v. Home Sav. & Loan Ass'n,* 265 F.2d 643, 647 (9th Cir.1958) (quoting *Cisco v. Van Lew,* 60 Cal.App.2d 575, 141 P.2d 433, 438 (1943)).

[38]The district court correctly determined that whatever interest the Government held in Benjamin Kramer's forfeited property dated back to the time of the act that made the Club subject to forfeiture; that is, when Benjamin Kramer first invested his drug proceeds in the Club. *Kramer,* 807 F.Supp. at 738. This means that any subsequent transfer of part or all of a defendant's tainted property does not automatically extinguish the government's superior entitlement to the property. *See United States v. Bissell,* 866 F.2d 1343 (11th Cir.1989). This is known as the relation back doctrine. It was codified in the RICO statute, 18 U.S.C. § 1963(c) (reprinted *infra* note 43), as part of the 1984 amendments to "close a potential loophole in current law whereby the criminal forfeiture sanction could be avoided by transfers that were not 'arms' length.' " *See* S.Rep. No. 98-225, 200-01 (1984), *reprinted in* 1984 U.S.C.C.A.N. at 3383-3384. Congress reasoned that "[a]bsent application of this principle a defendant could attempt to avoid criminal forfeiture by transferring his property to another person prior to conviction." *Id.* at 200, *reprinted in* 1984 U.S.C.C.A.N. at 3383. A third-party whose property has been made part of a forfeiture order must file a petition in the ancillary hearing in order to contest the forfeiture.

to half of her husband's interest in the Club at the time Michael Gilbert bought into LCP. The court denied her petition in its entirety, reasoning that she was not a bona fide purchaser because she "knew, or at least should have known of the tainted nature of her husband's interest." *Id.* The court also denied the claim of the Trust. *Id.* at 742.

Following the ancillary hearings, Karen Gilbert and the Trust appealed the district court's decision denying them any interest in the Club.[39] These appeals were consolidated with the appeal of Benjamin Kramer's and Michael Gilbert's convictions.[40] Both Benjamin Kramer and Michael Gilbert appealed their RICO and Travel Act convictions; Michael, alone, contested the forfeiture judgment. *See Kramer,* 73 F.3d at 1070.[41]

F.

On appeal, we affirmed Benjamin Kramer's convictions. *Kramer,* 73 F.3d at 1070 n. 1. As for Michael Gilbert, we affirmed his RICO and Travel Act convictions, reversed his money laundering conviction, *id.* at 1072-73, and set aside the forfeiture order against him. *Id.* at 1075-76. With respect to the order forfeiting Michael Gilbert's interest in the Club, we reasoned that:

> Property forfeitable in a RICO proceeding is limited to that which the defendant obtains directly or indirectly as a result of the racketeering activity. *See* 18 U.S.C. § 1963(a)(3). The only acts of racketeering which were both charged by the government and found by the jury to have been committed by Gilbert occurred after he had obtained his interest in the [Club]. Property acquired before a defendant commits an act of racketeering cannot be said to have been derived from it. As such, the forfeiture of Michael Gilbert's interest in the [Club] must be set aside.

*Id.* at 1076. Consequently, we concluded further in a footnote that:

> Because we hold that Michael Gilbert's interest in the [Club] is not subject to forfeiture, neither are the interests of Karen Gilbert and [the Trust]. And, orders restraining Michael Gilbert, Karen Gilbert or the [Trust] from the use and enjoyment of their interest in the [Club], including profits, are to be,

---

[39]Lyon and the Lyon Trust also filed timely notices of appeal from the judgment in the ancillary hearing. Both subsequently dismissed their appeals in connection with Dale Lyon's guilty plea in the United States District Court for the Southern District of Florida, in which he admitted obstructing justice and committing perjury in the ancillary hearing. As a result, the Government acquired their remaining two-thirds interest in LCP, Ltd. and Lyon was sentenced to three months' imprisonment and a $20,000 fine. *United States v. Lyon,* No. 91-06192 (S.D. Fla. June 30, 1993).

[40]For simplicity, we refer to these consolidated appeals as "the 1996 appeal."

[41]Benjamin Kramer was sentenced on August 29, 1990 to a forty-five year jail term and ordered to pay a fine of $460,000. Jack Kramer was sentenced on August 29, 1990 to nineteen years in prison and ordered to pay a $200,000 fine. Michael Gilbert was sentenced on August 28, 1990 to four years in prison and was ordered to pay a $350,000 fine. None of the three defendants was ordered, as part of his sentence, to forfeit any property to the Government. We discuss in Part IV.D., *infra,* the ramifications of the district court's failure to order forfeiture as part of the final judgment.

for them, set aside also.

> Because the government, as we understand it, still does have some interest in the [Club] due to other forfeitures, we anticipate the district court, will, in the light of the differing ownership interests, need to hold a hearing or hearings and to issue additional orders about the [Club]'s future operations upon the district court's receiving of the mandate from this court.

*Id.* at 1076 n. 23.

After we handed down our decision on January 16, 1996, the Government sought rehearing and modification on the issue of resentencing, arguing that the district court should be allowed to resentence Michael Gilbert since a valuable property interest was returned to him.[42] Rehearing was denied in July, and our mandate issued on July 18, 1996. The mandate stated, "it is now hereby ordered and adjudged by this Court that the judgments and convictions of the District Court in these causes be and the same hereby AFFIRMED except as to Gilbert's conviction for money laundering and the forfeiture judgment which are REVERSED."

Back in the district court, the Gilberts moved for an Order on the Mandate. Not to be outdone, the Government moved the district court to enter a protective order "maintaining the status quo of the Gilberts' alleged interests in the [Club]." The Government's motion requested that the district court "enter an order directing that the defendant Michael S. Gilbert be required to file a petition pursuant to 18 U.S.C. § 1963(*l* )." In other words, the Government wanted Michael Gilbert to claim a third-party interest in Kramer's forfeited property, just as the other non-defendants had done in the ancillary proceedings. In support of its motion, the Government argued that Michael Gilbert "should be viewed ... in the same way as other alleged 'owners' of an interest in the [Club]," for example, Pierson and Coyne, who settled with the Government prior to the ancillary hearing, or Lyon, who participated in the ancillary hearing and was denied one-third of his LCP, Ltd. interest. The Government further argued that "to permit defendant Michael S. Gilbert to forgo having to do that which Lyon, Coyne and Pierson were required to do would be to permit Gilbert to forgo having to establish his alleged legitimate ownership interest, despite being the only LCP partner to be a convicted RICO defendant."

Under the Government's reading of our 1996 decision setting aside Michael Gilbert's forfeiture verdict, we resolved only that Michael Gilbert's interest in the Club was improperly forfeited because it was

---

[42]The Government took its cue from a footnote in the district court's Amended Final Order of Forfeiture following the ancillary hearing in which the court stated that, in light of the evidence presented at the hearing (which never surfaced during the criminal trial), it would welcome an opportunity to increase Michael Gilbert's sentence. *See Kramer,* 807 F.Supp. at 741 n. 30.

not derived, directly or indirectly, from *his* racketeering activity. The Government notes in its brief that our "opinion [did] not address the issue of whether the Gilberts are entitled to their interest in the [Club] pursuant to 18 U.S.C. § 1963(*l* ) as either superior title holders ... or bona fide purchasers for value without reasonable cause to believe the property was subject to forfeiture." Thus, the Government maintains that since Michael Gilbert's interest in LCP, Ltd. was acquired after the violations that gave rise to Benjamin Kramer's forfeiture, and since our 1996 decision left intact the verdict of forfeiture reaching Benjamin Kramer's interest in the Club, the Gilberts were subsequent transferees under 18 U.S.C. § 1963(c).[43] As such, the Government contends that the Gilberts should be required to show that they acquired their interests without cause to believe that it was subject to forfeiture.

Following a hearing, the district court denied the Government's request for a protective order and contemporaneously entered an order on the mandate. The district court reasoned that the Government's argument, "however sound and well-reasoned it might be ... could have been pursued much earlier in these proceedings. The government could have raised this during the ancillary proceedings, the appeal and the petition for rehearing or have sought certiorari in the Supreme Court, but did not. As such, the government has waived this issue. *United States v. Thompson,* 710 F.2d 1500 (11th Cir.1983)." The Government filed a motion for reconsideration, which the district court denied on March 10, 1997. The Government then took this appeal.[44]

---

[43]Section 1963(c) reads:

> All right, title, and interest in property described in [the RICO statute] vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (*l* ) that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

18 U.S.C. § 1963(c); *see also supra* note 38.

[44]During the pendency of this appeal, the district court authorized the United States to dispose of its interest in the Club. Julie Coyne, who had settled with the Government rather than take part in the ancillary proceedings, opposed the sale, claiming that she was entitled to acquire the Government's interest in LCP (which at that time represented a 10% general partnership interest and a 36.45% limited partnership interest) under a right of first refusal written into the LCP general partnership agreement. The district court denied her claim, finding that since she had acted in concert with Benjamin Kramer, she was statutorily barred from purchasing the Government's interest. *See United States v. Kramer,* 957 F.Supp. 223, 228 (S.D.Fla.1997) ("Section (f) of 18 U.S.C. § 1963 does not require that Julie Coyne be indicted and found guilty before she can be barred from purchasing the government's interest. The statute requires that she have 'acted in concert with' defendants. That Julie Coyne did...."). Coyne appealed that decision

II.

A.

As a threshold matter, we must address the Gilberts' challenge that we lack jurisdiction to hear this appeal. The Government maintains that 28 U.S.C. § 1291[45] is a proper basis for our jurisdiction because the district court's denial of the Government's request for a protective order conclusively resolves conflicting ownership interests in the Club. As such, the Government posits that its appeal is from a final judgment. The Gilberts, on the other hand, contend that section 1291 is not a proper basis for the Government's appeal because section 1291 does not authorize the United States to appeal final orders in criminal cases. *See United States v. Horak,* 833 F.2d 1235, 1247 n. 10 (7th Cir.1987). The Government side-steps the fact that section 1291 is inapplicable to government appeals from criminal cases by asserting that the Government is "appealing the district court's ruling in the ancillary forfeiture proceeding, and not the criminal proceeding against Gilbert himself." The Government's brief also emphasizes that its appeal relates to the district court's order denying the Government's request "to require [the Gilberts and the Trust] to file third-party petitions in the ancillary proceeding relating to the criminal forfeiture of [Benjamin] *Kramer's* interest" in the Club. In other words, the Government seeks to use the 1990-91 ancillary proceeding regarding Benjamin Kramer's forfeited property as the basis for its requested protective order.

1.

The question which confronts us at this stage is whether a third-party proceeding ancillary to a criminal forfeiture prosecution is a criminal or civil proceeding for the purposes of a government appeal. If

---

to this court (Case Nos. 97-4475, 97-5173, 97-5174) and we heard oral argument on October 8, 1998. While a decision in Coyne's case was still pending, Coyne consented to the Government selling its LCP interest to a different buyer. The Government and Coyne then agreed that the right of first refusal issue was moot. In their Joint Motion to Dismiss Appeal, the Government conceded that "the United States no longer owns any interest in LCP or the Bell Garden's Bicycle Club." We granted dismissal in that case, thus raising the possibility that the present case was subsequently rendered moot by the Government's total divestiture. Upon request by this court, the Government assuaged our concern—the Government had curiously agreed "as part of the sale of its forfeited interest ... to sell the Michael Gilbert, Karen Gilbert, and Trust, interests if and when those interests are finally forfeited to and owned by the United States." (We say "curiously" in light of the fact that the Government informs us that the Gilbert family limited partnership interests are currently valued at over ten million dollars. The legal card club business in California must indeed be a profitable business for a buyer to agree to a sale that might prove $10 million short.)

[45]28 U.S.C. § 1291 provides us with jurisdiction over "appeals from all final decisions of the district courts of the United States." A final decision is one that " 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " *Pitney Bowes, Inc. v. Mestre,* 701 F.2d 1365, 1368 (11th Cir.1983) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)).

a section 1963(*l* ) ancillary proceeding is civil in nature, as the Government contends, then our jurisdiction over the appeal would be proper; but if the ancillary proceeding is criminal in nature, the Government would lack statutory authorization to bring this appeal under section 1291. *See Horak,* 833 F.2d at 1247 n. 10 ("Nothing in section 1291 grants the executive the power to appeal all (or for that matter any) final orders in criminal cases."). Surprisingly, no other circuit has addressed this question directly.[46]

In *United States v. Douglas,* 55 F.3d 584 (11th Cir.1995), we held that an ancillary proceeding pursuant to 21 U.S.C. § 853(n)[47] was "a civil action" for the purpose of allowing a third party to recover attorneys' fee awards against the United States under the Equal Access to Justice Act. *Douglas* involved a third-party claimant who filed a petition opposing criminal forfeiture of certain property under a provision of the statute identical to section 1963(*l* ). *Id.* at 586 & n. 9. After prevailing on a summary judgment motion and thereby successfully establishing his claim to the forfeited property, the third-party moved for attorney's fees pursuant to the EAJA. *Id.* at 586. Finding that "the government apparently made no investigation into factual background prior to seeking forfeiture," the district court awarded the third-party approximately $21,000 in attorney's fees. *Id.* (internal quotation omitted).

On appeal, the government argued that a third-party proceeding ancillary to a criminal forfeiture prosecution was not a civil case and therefore the assessment of fees against the government was in error. The *Douglas* court's section 853(n) analysis applies just as easily to section 1963(*l* ). *See United States v. Bissell,* 866 F.2d 1343, 1348 n. 3 (11th Cir.1989) ("[O]ur discussion and holdings apply equally to the

---

[46] *But cf. United States v. Douglas,* 55 F.3d 584, 588 (11th Cir.1995) (holding that a third-party claim in a proceeding ancillary to criminal forfeiture is to be considered a civil action for purposes of permitting an award of attorney's fees under the Equal Access to Justice Act); *United States v. Alcaraz-Garcia,* 79 F.3d 769, 772 n. 4 (9th Cir.1996) (stating that an appeal from the denial of a third-party petition under 21 U.S.C. § 853(n) is civil in nature for purposes of determining the timeliness of filing the appeal under Fed. R.App. P. 4.); *United States v. Lavin,* 942 F.2d 177, 181-82 (3d Cir.1991) (same); *but see United States v. BCCI Holdings,* 980 F.Supp. 529, 533-534 (D.D.C.1997) (holding that for the purposes of a *Kastigar* hearing, "RICO third-party criminal forfeiture proceedings under § 1963(*l* ) are 'criminal cases' within the meaning of 18 U.S.C. § 6002"). We note in passing that our independent research uncovered only one case where the government appealed an adverse ruling in an ancillary hearing. The Fourth Circuit Court, unfortunately, did not address the basis for its appellate jurisdiction. *See United States v. Reckmeyer,* 836 F.2d 200 (4th Cir.1987).

[47] 21 U.S.C. § 853 deals with criminal forfeiture in narcotics cases brought under the Continuing Criminal Enterprise statute, 21 U.S.C. § 848 et seq. (1994). Section 853(n) is "substantially identical" to section 1963(*l* ). *United States v. Ripinsky,* 20 F.3d 359, 362 n. 3 (9th Cir.1994). Cases applying one of these analogous statutes have used section 853(n) and section 1963(*l* ) cases interchangeably. *See e.g., United States v. Bissell,* 866 F.2d 1343, 1348 n. 3 (11th Cir.1989). The legislative history of RICO has been used to interpret congressional intent in section 853(n) cases because Congress adopted section 1963(*l* )'s language when it crafted section 853(n). *See Douglas,* 55 F.3d at 586 n. 9; *United States v. Lavin,* 942 F.2d 177, 185 n. 9 (3d Cir.1991).

forfeiture provisions in 21 U.S.C. § 853 as to those found in 18 U.S.C. § 1963."). The *Douglas* court first looked at nature of a section 853(n) proceeding and noted that "[o]nce a criminal forfeiture prosecution has been filed, third parties are expressly barred by 21 U.S.C. § 853(k)(2) from 'commenc[ing] an action at law or equity against the United States concerning the validity of [their] interest in the property' *except* 'as provided in [section 853(n) ].' " *Douglas,* 55 F.3d at 586 (alterations and emphasis in original); *see also* 18 U.S.C. § 1963(i)(2) (containing language analogous to § 853(k)(2)). From this provision, the *Douglas* court gleaned that a section 853(n) suit was meant to operate as a "substitute for separate *civil* litigation against the government." *Id.* (emphasis in original). In a footnote, the court further buttressed its conclusion that "Congress considered this ancillary proceeding to be essentially civil" by turning to the legislative history of section 1963(*l* ). *Id.* at n. 9. There the court found that Congress intended that third-party petitions ancillary to a criminal forfeiture take the place of civil cases, and that such a procedure would enable innocent parties to adjudicate their property interests swiftly instead of having to file separate civil suits.[48] *Id.* We find that the *Douglas* court's analysis applies beyond the mere confines of determining whether ancillary proceedings are "civil actions" within the meaning of the EAJA. For the same reasons expressed in *Douglas,* we conclude that a third-party petition filed under section 1963(*l*) is civil in nature even though it is ancillary to a criminal forfeiture trial. Accordingly, we believe that the Government can properly appeal the district court's denial of its motion for a protective order relating to the Government's interest in Benjamin Kramer's forfeited property.

2.

While we agree with the Government that section 1963(*l* ) ancillary proceedings should be considered civil proceedings for the purposes of appellate review, we disagree that section 1291 is a proper basis for our jurisdiction in the instant appeal. The Government's motion for a "protective order" requested that the district court: (1) "enter an order directing that the defendant Michael S. Gilbert be required to file a petition pursuant to 18 U.S.C. § 1963(*l*) within thirty (30) days" and (2) "enter a Protective Order maintaining the status quo of the Gilberts' alleged interests in the [Club] until" the district court resolved the

---

[48]the indictment or information is filed, a third party is not to commence a civil suit against the United States; instead the third party should avail himself of the ancillary hearing procedure.... This provision assures a more orderly disposition of both the criminal case and third party claims. Indeed, it is anticipated that the new hearing procedure should provide for more expedited consideration of third party claims than would the filing of separate civil suits.

H.R.Rep. No. 98-1030, at 206-07 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3389-90.

issue in (1) above. While the Government's motion is couched as request for a protective order, this designation is nothing more than smoke and mirrors. In effect, the Government has taken a request for an *injunction*—ordering Michael Gilbert to file a third-party petition pursuant to section 1963(*l* )—and cleverly dressed it up to look like a request for a protective order.[49]

It is clear from the language of the Government's motion that the "status quo" of the Gilberts' property stands or falls upon the district court's decision to grant (or deny) the injunction. We conclude, therefore, that the Government's motion should be properly treated as a request for an injunction. *Cf. Chatman v. Spillers,* 44 F.3d 923, 924 (11th Cir.1995) (finding jurisdiction under 28 U.S.C. § 1292(a)(1) because plaintiffs' request for an order directing the defendants to call special elections could be characterized appropriately as an injunction). Because we believe that the district court's refusal to grant the Government's request is more appropriately labeled a denial of an injunction, we find that 28 U.S.C. § 1292(a)(1)[50] is the appropriate jurisdictional basis for our review in this case. The Government's misidentification of the proper jurisdictional basis, however, is not fatal to its appeal. *Spartacus Inc. v. Borough of McKees Rocks,* 694 F.2d 947, 949 n. 4 (3d Cir.1982) (reviewing the merits of the action even though both the appellant and appellee incorrectly relied on section 1291 for appellate jurisdiction when in fact section 1292(a)(1) was proper). Having assured ourselves that this appeal is properly before us, we now proceed to the merits of the Government's argument.

B.

A mixed standard of review applies when a district court grants or denies an injunction. We review the district court's decision to grant or deny an injunction for clear abuse of discretion, *United States v. Bd. of Educ. of Greene County, Mississippi,* 332 F.2d 40, 45-46 (5th Cir.1964), but underlying questions of law are reviewed *de novo. United States v. Pruitt,* 174 F.3d 1215, 1219 (11th Cir.1999) (" 'A district court by definition abuses its discretion when it makes an error of law.' ") (quoting *Koon v. United States,* 518 U.S.

---

[49]An injunction ordering a party to "take action," such as file a third-party claim, is properly labeled a mandatory injunction. *See Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 484 116 S.Ct. 1251, 1254, 134 L.Ed.2d 121 (1996); *see also Tom Doherty Assoc. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995) ("A mandatory injunction, in contrast [to a prohibitory injunction], is said to alter the status quo by commanding some positive act."). The most common type of injunctions "restrain" a party from doing something and such injunctions are properly labeled prohibitory injunction. *Id.*

[50]Section 1292(a)(1) authorizes appellate jurisdiction of "[i]nterlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions." 28 U.S.C. § 1292(a)(1) (1994).

81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)). The Government's position assumes that the district court has the power to enter an injunction requiring the Gilberts and the Trust to file third-party petitions in the ancillary proceeding relating to Kramer's forfeited property. Since this assumption is a purely legal one, we review it *de novo.*

## III.

## A.

The Government must demonstrate a substantive or procedural right before it may obtain an injunctive remedy. Thus, we must look to RICO's statutory forfeiture scheme to determine whether it grants the Government a right to force third-parties to file petitions in a section 1963(*l* ) ancillary proceeding.[51]

## 1.

The RICO statute, introduced into law by the Organized Crime Control Act of 1970, "was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots" by providing "enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." *Russello v. United States,* 464 U.S. 16, 26-27, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (citing Pub.L. No. 91-452, 84 Stat. 922, 923 (1970)) (quotations omitted). One such weapon in the RICO arsenal was the forfeiture scheme, which sought to strike at the heart of an illegal enterprise by confiscating tainted property and proceeds in hopes of putting the criminal enterprise out of business. *See United States v. Angiulo,* 897 F.2d 1169, 1213 (1st Cir.1990). This weapon, however, has often left third-party property holders feeling particularly vulnerable when, for instance, "their property appears to be the defendant's and the defendant is ordered to forfeit that property to the Government." *See United States v. Schwimmer,* 968 F.2d 1570, 1573 (2d Cir.1992).

---

[51]The Government's request is apparently an unprecedented move; our independent research has uncovered no case in which the Government has attempted to obtain such an injunction. The Gilberts and the Trust completely fail to question the propriety of the Government's motion, arguing instead that the Government's request is barred by the law of the case doctrine or, alternatively, that we lack jurisdiction to hear the Government's appeal (*see supra* Part II.A.).

The law of the case doctrine dictates that "both the district court and the court of appeals generally are bound by findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case." *United States v. Robinson,* 690 F.2d 869, 872 (11th Cir.1982). The law of the case doctrine does not apply in this case because the issue in the 1996 appeal was whether Michael Gilbert's interest in the Club was properly forfeited under the Government's theory at trial, i.e., that his interest was derived from his own racketeering activity. The issue in this appeal, however, is whether the Government can force a third-party subsequent transferee, as defined in 18 U.S.C. § 1963(c), to file a section 1963(*l* ) petition.

Surprisingly, from RICO's enactment in 1970 until 1984, RICO's forfeiture provisions contained no procedure by which a third-party property holder could adjudicate his claim to forfeited property. Instead, an innocent third-party who claimed an interest in forfeited property could only petition the Attorney General, who had been exclusively charged with making "due provision for the rights of innocent persons." 18 U.S.C. § 1963(c) (1984), *amended by* Pub.L. 98-473 (1984). Compounding the problem, third-parties who were dissatisfied with the Attorney General's final decision regarding their ownership claim were unable to obtain judicial review of the Attorney General's decision. *See* S.Rep. No. 98-225, at 209 (1990), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3392. Fourteen years after RICO's enactment, Congress recognized the inequity inherent in such a procedure and amended the statute by enacting the Comprehensive Crime Control Act, Pub.L. No. 98-473, 98 Stat. 1837. *See id.* at 3390-91. The amendment set up an orderly procedure whereby third-parties whose property interests had been criminally forfeited could challenge the validity of the forfeiture order and establish their legitimate ownership interests in the district court.

Under current RICO forfeiture provisions, third-parties must wait for a final order of forfeiture in the criminal trial before they can "hale the government into [court]" to adjudicate their interests in forfeited property. *United States v. Kramer,* 912 F.2d 1257, 1261 (11th Cir.1990); *see also* 18 U.S.C. § 1963(i). The order of forfeiture is a required element of sentencing for criminal RICO violations and is entered as part of the final judgment. 18 U.S.C. § 3554; 18 U.S.C. § 1963(e); Fed.R.Crim.P. 32(d)(2); *United States v. L'Hoste,* 609 F.2d 796, 809-13 (5th Cir.1980)[52] (holding that forfeiture is a mandatory element of sentencing for a violation of 18 U.S.C. § 1962); *United States v. Derman,* 211 F.3d 175, 182 n. 9 (1st Cir.2000) ("[T]he forfeiture order entered at sentencing is called 'final order of forfeiture' and ... is appealable."). Once an order of forfeiture has been handed down (as part of the final judgment), the court, pursuant to Fed.R.Crim.P. 32(d)(2), may authorize the Attorney General to "seize the property subject to forfeiture" and begin carrying out "statutory requirements pertaining to ancillary hearings and the rights of third parties." Fed.R.Crim.P. 32(d)(2) (1996).[53] One such statutory requirement is that the government "publish notice of the order and ....

---

[52] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[53] Before its amendment in 1996, the relevant provision of Rule 32 read:

> (2) *Criminal Forfeiture.* When a verdict contains a finding of property subject to a criminal forfeiture, the judgment of criminal forfeiture shall authorize the Attorney General to seize the interest or property subject to forfeiture, fixing such terms and conditions as the court shall deem proper.

to the extent practicable, provide direct written notice to any person known to have alleged an interest in the property." 18 U.S.C. § 1963(*l* )(1). The government's obligation to give constructive notice to all potential third-parties, and preferably direct notice to known third parties with an interest in the forfeited property, is a vital requirement of RICO's forfeiture provisions since the property rights of third-parties who do not file petitions in the ancillary proceeding are automatically extinguished. *See* 18 U.S.C. § 1963(*l* )(7).

Next, the statute defines the class of people who are entitled to challenge the order of forfeiture and sets forth the time limits applicable to such challenges:

> Any person other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

18 U.S.C. § 1963(*l*)(2). The filing of third-party claims, therefore, is reserved to persons other than the defendant[54] who claim to have a "legal interest" in the forfeited property. Additionally, third-parties must file their petitions within thirty days from receipt or final publication of notice, or lose the right to establish their interest in the forfeited property. By specifically barring third-parties from intervening in the criminal trial, 18 U.S.C. § 1963(k), it is clear that Congress intended section 1963(*l* ) proceedings to provide the exclusive means for third-parties to assert their claims to forfeited property. *Cf. United States v. Phillips,* 185 F.3d 183, 186 (4th Cir.1999) (applying analogous provisions of 21 U.S.C. § 853(n)).

Section 1963(*l* ) also limits the grounds upon which a third-party petitioner may rely to establish his interest in the property. To establish his legitimate entitlement to the forfeited property, the petitioner must show that (1) title to the property was vested in him rather than the defendant at the time of the act which made the property subject to forfeiture;  (2) his title to the property was superior to the title held by the defendant at the time of the act which made the property subject to forfeiture;  or (3) that he purchased his interest without reasonable cause to know that the property was subject to forfeiture. *See* 18 U.S.C. § 1963(*l*

---

Fed.R.Crim.P. 32(b)(2) (1990) (current version at Fed.R.Crim.P. 32(d)(2)).

[54]Michael Gilbert contends that he cannot be made to file a third-party petition since the statute applies to "[a]ny person other than the defendant." 18 U.S.C. § 1963(*l* )(2). He argues that since he was a defendant in the underlying RICO prosecution, he is statutorily barred from filing a third-party petition. By including this provision in § 1963(*l* )(2), Congress undoubtedly sought to prevent the defendant *whose property had been forfeited* from circumventing the forfeiture order and litigating anew his entitlement to the property. With respect to Benjamin Kramer's forfeited property, Michael Gilbert is properly viewed as a third-party subsequent transferee under § 1963(c), rather than a defendant as the term is used in the statute.

)(6)(A)—(B) (reprinted in full *supra,* n. 30).  By successfully establishing one of these three grounds, the petitioner defeats the government's entitlement under the forfeiture order.  *See* 18 U.S.C. § 1963(*l*)(6) ("[T]he court *shall* amend the order of forfeiture in accordance with its determination.") (emphasis added).  Not to be overlooked, however, is that the third-party petitioner, and not the government, bears the burden of proving one of these limited grounds by a preponderance of the evidence.  Congress chose to place the burden of proof on the third-party during the ancillary proceeding, since the government would necessarily have carried its burden of proving that the defendant's interest in the property was subject to forfeiture during the criminal trial.  *See* S.Rep. No. 98-225, at 209 (1990), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3392.  Finally, section 1963(*l* ) declares that "[f]ollowing the court's disposition of all petitions filed under this subsection, or if no such petitions are filed following the expiration of the period provided in paragraph (2) for the filing of such petitions, the United States shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee."  18 U.S.C. § 1963(*l* )(7).

As the foregoing reveals, a section 1963(*l* ) ancillary proceeding is essentially a quiet title proceeding.  First, the jury's special verdict of forfeiture establishes the extent of the defendant's interest in a certain forfeitable asset.  Next, the forfeiture order, in effect, puts the government in the defendant's shoes and the government succeeds to whatever interest, if any, that defendant had in the property.  The section 1963(*l* ) ancillary proceeding then enables certain third-parties to file claims in order to establish their interest in the defendant's (now the government's) property.  If one or more of the third-party claims is successful, the court releases those interests and amends its order of forfeiture accordingly.  *See* 18 U.S.C. § 1963(*l* )(6).

The language of the statute makes clear that if a third-party does not file a petition in the ancillary proceeding within thirty days of receipt or publication of notice, his rights in the defendant's forfeited property are automatically extinguished and the government obtains "clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee."  18 U.S.C. § 1963(*l* )(7).  By virtue of its forfeiture judgment and the fact that the time for filing ancillary petitions has run or such proceedings have been concluded, the government succeeds as against the world to the defendant's property.  In other words, the government has effectively quieted its title to the defendant's property and owns it outright.

2.

Applying the section 1963(*l* ) model to the instant case, we note initially that the condition precedent

to an ancillary proceeding—the entry of a final order of forfeiture—has apparently not been met. In

sentencing Benjamin Kramer on August 29, 1990, the district court failed to enter a judgment of forfeiture

as required by 18 U.S.C. § 3554,[55] 18 U.S.C. § 1963(e),[56] and Rule 32(b)[57] of the Federal Rules of Criminal

Procedure. The order of forfeiture upon which the parties rely—entered immediately following the jury

verdicts on April 3, 1990—was not part of Kramer's sentence, and therefore could have done nothing more

than *temporarily* restrain the property pending sentencing. That order was superseded by the court's final

judgment on August 29, which made no mention of forfeiture.

As noted *supra* in Part III.A.1., third-parties *cannot* petition the court to adjudicate their interests in

forfeited property until a final order of forfeiture has been entered in the criminal case. If such an order was

ever entered against Benjamin Kramer, we are unable to locate it in the record. Rather, the final judgment

in the criminal case only sentenced Kramer to prison confinement and a fine. This fact alone is sufficient to

affirm the denial of the Government's request, because third-parties such as the Gilberts are not permitted to

file section 1963(*l*) petitions in the absence of a final order of forfeiture. Given the convoluted nature of this

case, however, and the fact that the parties have long relied on the existence of a final order of forfeiture, we

---

[55] 18 U.S.C. § 3554 provides that:

> The court, in imposing a sentence on a defendant who has been found guilty of an offense
> described in section 1962 of this title ... shall order, in addition to the sentence that is
> imposed pursuant to the provisions of section 3551, that the defendant forfeit property to
> the United States in accordance with the provisions of section 1963 of this title....

[56] 18 U.S.C. § 1963(e) states, in pertinent part: "Upon conviction of a person under this section, the court shall enter a judgment of forfeiture of the property to the United States and shall also authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court shall deem proper...."

[57] At the time of trial, Fed.R.Crim.P. 32(b) read:

> (b) Judgment.
>
> (1) In General. A judgment of conviction shall set forth the plea, the verdict or findings, and the adjudication and sentence....
>
> (2) Criminal Forfeiture. When a verdict contains a finding of property subject to a criminal forfeiture, the judgment of criminal forfeiture shall authorize the Attorney General to seize the interest or property subject to forfeiture, fixing such terms and conditions as the court shall deem proper.

Fed.R.Crim.P. 32(b) (1990) (current version at Fed.R.Crim.P. 32(d)).

shall defer our consideration of the issue.[58]  For the moment, we will assume that a final order of forfeiture was entered, and turn to 18 U.S.C. § 1963(*l* ) to determine whether the Government can force the Gilberts to file petitions claiming an interest in Kramer's forfeited property.

3.

"In determining whether to infer a private cause of action from a federal statute, our focal point is Congress' intent in enacting the statute." *Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988).  In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), the Supreme Court set out four factors as guides to discerning that intent:  (1) whether the plaintiff is one of the class for whose benefit the statute was enacted;  (2) whether there is any indication of legislative intent, explicit or implicit, either to create or to deny a private remedy;  (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme;  and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law.[59]  "The intent of Congress remains the ultimate issue....  '[U]nless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.' " *Thompson,* 484 U.S. at 179, 108 S.Ct. at 516 (quoting *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981)).

We need not consider all four factors of the *Cort* analysis, as our consideration of the first two factors is dispositive.  *See Florida v. Seminole Tribe of Florida,* 181 F.3d 1237, 1247 (11th Cir.1999) ("[W]hen an examination of one or more of the *Cort* factors 'unequivocally reveals congressional intent[,] there is no need for us to trudge through all four of the factors.' ") (quoting *Liberty Nat'l Ins. Holding Co. v. Charter Co.,* 734 F.2d 545, 558 (11th Cir.1984) (alteration in original)).  Under *Cort* 's first factor, the language and legislative history of section 1963(*l* ) demonstrate that the statute was designed to protect only the property rights of innocent third-parties, not those of the government.  Accordingly, it appears under the second factor of the

---

[58]Because the omission of a final order of forfeiture has severe ramifications in any criminal forfeiture proceeding, we discuss the omission in further detail in Part IV.D., *infra.*

[59]Since its decision in *Cort,* the Supreme Court has become more restrained in its willingness to find an implied private right of action.  *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) (adopting a "stricter standard" of "congressional intent").  Today, the Court requires some affirmative evidence of congressional intent, in "the language and focus of the statute, its legislative history, and its purpose." *Touche Ross,* 442 U.S. at 575-76, 99 S.Ct. at 2489.

*Cort* analysis that Congress did not intend to create the injunctive remedy sought by the Government in this case. Indeed, there is no need for a proceeding in which the government may assert its claim to forfeited property, as the statutory scheme outlined in section 1963(*l*) is self-executing. That is, aside from providing the required notice, the government need not take *any* affirmative action if third-parties neglect to file claims to forfeited property. Even if a petition is filed, section 1963(*l*) places the burdens of production and persuasion on the petitioner. 18 U.S.C. § 1963(*l*)(6). After the ancillary proceedings have ended, or the time for filing petitions has run, the government automatically succeeds to the remaining forfeited property by operation of law.[60] The government need not force third-party owners to appear in court so that their interests may be extinguished; those who have notice but do not appear lose their interests by default. At the end of the ancillary proceedings, the court must amend its order of forfeiture to reflect any successful third-party claims. 18 U.S.C. § 1963(*l*)(6). If none of the third-party claims was successful, or if no petitions were filed during the statutory time period, the court need not amend its order. The government may, however, request an order from the court declaring that the government has met all of the statutory notice requirements, that no meritorious third-party claims were filed, and that the government has clear title to the forfeited property.

The structure of RICO's criminal forfeiture scheme clearly indicates that Congress did not expect the government to play an active role under section 1963(*l*). It is well settled that, absent compelling countervailing considerations or an absurd result, we may not disregard the clear, mandatory statutory scheme erected by Congress. *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). Section 1963(*l*) was enacted to allow innocent third-party owners to assert claims to forfeited property, not to assist the Government in *forcing* those third-parties to do so. Implying such a private cause of action in favor of the Government would directly contravene RICO's statutory forfeiture scheme, and the Government has presented us with no compelling countervailing consideration that would justify such a decision. Thus, we hold that the Government's requested injunction is not statutorily authorized by section 1963(*l*).

B.

1.

As a general matter, our conclusion that section 1963(*l*) proceedings are self-executing greatly benefits the Government. For instance, if a house, a car, or shares of stock were forfeited to the Government

---

[60]The "remaining forfeited property" will be that interest or property which was forfeited in the court's initial order of forfeiture and not successfully claimed by a third-party owner.

because the defendant purchased them with drug proceeds, the Government would automatically obtain clear title to any of those assets if no third-party petitions were filed before the statutory deadline. If there were any question about the propriety of the Government's title, the Government could simply move the court for an order declaring the status of its interest based on the final order of forfeiture and the disposition of third-party petitions. The question then arises: why would the Government ask a court to force third-parties to file section 1963(*l*) petitions when, as a result of the third-parties' failure to file, the Government would obtain clear title to the property automatically?

2.

As a result of our 1996 opinion setting aside the order of forfeiture against Michael Gilbert,[61] the Government is left with only that interest in property which belonged to Benjamin Kramer at the time it became subject to forfeiture. The problem, however, is that the exact nature of that interest is undetermined. In an attempt to correct fundamental errors made during the criminal trial, the district court modified the forfeiture verdict (returned on April 2) and initial order of forfeiture (entered on April 3) after it heard evidence in the ancillary proceedings.[62] The resulting Amended Final Order purported to forfeit *Kramer's interest in LCP, Ltd.,* rather than the entire Bell Gardens Bicycle Club. The court made this change despite the fact that LCP, Ltd. was not named in the indictment, verdict, or initial order of forfeiture. The Government, believing that the court's post-trial amendment was valid, now claims title to Kramer's interest in LCP, Ltd., rather than the Club.

The dilemma presented by this purported change is that the Government does not know the extent of Kramer's interest—and, therefore, the extent of *its own* interest—in LCP, Ltd. Because the jury was never instructed to determine Kramer's interest in the partnership, his interest could conceivably range anywhere from .01 to 100 percent. Thus, what the Government has, at best, is an *unspecified* interest in LCP, Ltd. The question now becomes: what can the Government do with that unspecified interest?

What the Government presumably *wants* to do is sell its interest in LCP, Ltd. This would not

---

[61]We set aside the forfeiture verdict against Michael Gilbert because, under a logical reading of section 1963(a)(3), Michael Gilbert could not have obtained his LCP, Ltd. interest as a result of his racketeering activity since the jury found him guilty of racketeering acts occurring only after he acquired his interest. *Kramer,* 73 F.3d at 1076.

[62]For instance, the trial court presumably realized during the ancillary proceedings that a Joint Venture, rather than any defendant in the case, owned the Bell Gardens Bicycle Club. *See infra,* Part IV.B.

normally be a problem, as the time for filing third-party petitions has long passed and title to the interest has vested in the Government by operation of law. *See* 18 U.S.C. § 1963(*l* )(7).[63] In any other case, the Government would simply present the final order of forfeiture to the general partners of LCP, Ltd. and have the LCP, Ltd. Partnership Agreement amended to reflect the Government's ownership interest.[64] Of course, if the partnership agreement were not amended, a percentage of LCP, Ltd. would remain in the Gilberts' names. A prospective purchaser, aware of the 1996 decision in which we held that those ownership interests did not derive from Michael Gilbert's racketeering activity, would be unsure about the source of the interests and would quickly conclude that he was buying a lawsuit. Thus, the Government's interest in LCP, Ltd. is of little, if any, value until the Government obtains clear title to it.

The Government's problem in this case is that the LCP, Ltd. Partnership Agreement cannot be amended to reflect the Government's ownership interest because the Government has no evidence to establish what percentage of the partnership it owns. It is hardly sufficient for the Government to allege that it owns "some" of LCP, Ltd. The initial order of forfeiture contains no useful information, as it does not even mention LCP, Ltd. Moreover, the name "Kramer" is nowhere to be found on the LCP, Ltd. partnership documents, for the Kramers were either silent partners in LCP, Ltd., or simply two of the Club's illegitimate creditors.

The jury was never asked to make sense of the crucial partner/creditor distinction, or to delineate the extent of Kramer's ownership interest in LCP, Ltd. Instead, the court waited until the ancillary proceedings following the trial to address the difficult factual questions of ownership and apportionment. At the conclusion of those proceedings, the district court found that "the real owners of the Bicycle Club were Ben Kramer, Randy Lanier, Tom, known as George Brock, and ... Gene Fisher.... The LCP partners and Gilberts,

---

[63]Section 1963(*l* )(7) states:

> Following the court's disposition of all petitions filed under [section 1963(*l* ) ], or if no such petitions are filed following the expiration of the period provided in [section 1963(*l* )(2) ] for the filing of such petitions, the United States shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee.

18 U.S.C. § 1963(*l* )(7) (1994).

[64]The certificate of limited partnership would be properly amended by a general partner filing a certificate of amendment in the office of, and on a form prescribed by, the California Secretary of State. Cal. Corp. § 15622(a) (2000). If a general partner required to execute the certificate of amendment fails to do so within a reasonable time, or refuses to do so, or if there is any dispute concerning the filing of the certificate of amendment, any partner may petition the superior court to direct the execution of the certificate. If the court determines that the certificate should be filed, it shall order a party to file a certificate on the appropriate form prescribed by the Secretary of State. Cal.Code § 15625(b) (2000).

as well as [PPA] were just 'straw persons' for purposes of the licenses." *Kramer,* 807 F.Supp. at 736. It further found that "Ben Kramer held a one-third (1/3) ownership interest in LCP at the time of the commission of the acts giving rise to the forfeitability of the property."[65] *Id.* at 739.

The district court's post-trial findings, however, cannot retroactively amend the jury's verdict. Federal Rule of Criminal Procedure 31(e) gives a defendant a statutory right[66] to have the amount of property subject to forfeiture determined by a jury.[67] Fed.R.Crim.P. 31(e); *see also Libretti v. United States,* 516 U.S. 29, 48-49, 116 S.Ct. 356, 367-68, 133 L.Ed.2d 271 (1995); *United States v. Candelaria-Silva,* 166 F.3d 19, 43 (1st Cir.1999). Had the Government targeted LCP, Ltd. from the outset, Rule 31(e) would have required that the jury be instructed to identify (1) the interest, if any, each defendant held in LCP, Ltd., and (2) how much of each defendant's interest was subject to forfeiture.[68] Instead, the court created its own "simplified special verdict forms," which, like the indictment and jury instructions, focused on the Bell Gardens Bicycle Club. The verdict forms merely asked whether the Club "constituted or was derived from any proceeds which [the defendant] obtained directly or indirectly from racketeering activity," and if so, "whether The Bell

---

[65]With respect to Jack Kramer's interest in the Club, the district court concluded that "[c]learly Jack was not a partner in ownership." *Kramer,* 807 F.Supp. at 729. This determination only serves to underscore the inadequacy of the special verdict forms, as it impugns the jury's finding that Jack Kramer did, in fact, own a forfeitable interest in the Club.

[66]" 'The Federal Rules of Criminal Procedure have the force and effect of law. Just as a statute, the requirements promulgated in these Rules must be obeyed.' " *United States v. Cowan,* 524 F.2d 504, 505 (5th Cir.1975) (quoting *Dupoint v. United States,* 388 F.2d 39, 44 (5th Cir.1967)).

[67]Rule 31(e) of the Federal Rules of Criminal Procedure provides that "[i]f the indictment or the information alleges that an interest or property is subject to criminal forfeiture, a special verdict shall be returned as to the extent of the interest or property subject to forfeiture, if any." Fed.R.Crim.P. 31(e); *see also* Fed.R.Crim.P. 7(c)(2) ("No judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information shall allege the extent of the interest or property subject to forfeiture."). The Government in this case surely knew about this requirement; the RICO manual for federal prosecutors instructs that "[s]pecial verdict forms must be prepared so that the jury can make specific findings as to the extent of the forfeiture. The special verdict form must clearly and precisely describe the interests whose forfeitability the jury is considering." *Department of Justice, Criminal Division, Racketeer Influenced and Corrupt Organizations (RICO): A Manual for Federal Prosecutors* 113-14 (3d rev.ed., Sep. 1990) (footnote omitted).

[68]We note that this specificity requirement protects not only defendants, but also third-parties with interests in the defendant's forfeited property. If the verdict and subsequent order of forfeiture are vague, they greatly expand the universe of third-parties whose interests are in jeopardy and who therefore require notice. The specificity requirement also fosters judicial economy, as those who are unsure whether their interests are implicated may file petitions out of an abundance of caution and burden the courts with unnecessary litigation.

Gardens Bicycle Club [was] subject to forfeiture."[69] Since the verdict forms did not even suggest that LCP, Ltd. was an item of forfeitable property, the jury never had occasion to consider the extent of any defendant's interest in the partnership.

Because the court's "simplified" forms did not ask the jury to identify any defendant's interest in LCP, Ltd. or to determine whether that interest was subject to forfeiture, those questions must remain unanswered. Absent a waiver by defendants of their Rule 31(e) right to a jury determination of forfeiture, the court has no authority to amend the jury's verdict. *See United States v. Bornfield,* 145 F.3d 1123, 1138-39 (10th Cir.1998) (holding that where a jury verdict was invalid because it erroneously forfeited defendant's business, rather than personal, bank account, the trial court's forfeiture order could not stand absent a waiver of a jury trial on the issue of forfeiture). In short, then, the Government cannot know what percentage of LCP, Ltd. it holds, because the jury never made that determination.

3.

Let us assume, *arguendo,* that the district court *could* retroactively correct the forfeiture judgment against Benjamin Kramer, thereby giving the Government title to a fixed percentage of LCP, Ltd. In such a case, the Government might simply seek an order from the court declaring the status of its title, rather than a section 1963(*l*) proceeding. To fashion such an order, the court would most likely look to the findings it made during the ancillary proceedings to determine whether the Gilberts' interests were derived from Benjamin Kramer. If it found that they were, the court would then decide, based on the same evidence, whether Michael Gilbert *et al.* were nominee holders of Kramer's interest, or whether their ownership interests were otherwise tainted under section 1963(*l*)(6) because they were knowingly derived from Kramer's racketeering proceeds.[70]

One problem with this approach, however, is that the district court's prior findings on the issue of ownership are in direct conflict. While the court found that "of the defendants, only Ben Kramer and Michael Gilbert actually *owned a forfeitable interest* in the Club," 807 F.Supp. at 738 n. 22 (emphasis added), it also

---

[69]The forms also asked whether the $280,000 deposited into defendant Melvyn Kessler's Operating and Trust Accounts, or any portion thereof, was subject to forfeiture.

[70]Neither the Gilberts nor the Trust asserted an interest in Kramer's forfeited property during the ancillary proceedings. This was presumably because no one had yet alleged that they were subsequent transferees of his interest. Additionally, because Michael Gilbert was still a defendant in the case during those proceedings, he was precluded from claiming an interest in his own forfeited property. *See* 18 U.S.C. § 1963(*l*)(2).

found that "the real owners of the Bicycle Club were Ben Kramer, Randy Lanier, ... George Brock, and ... Gene Fisher," and that "[t]he LCP partners and *Gilberts ... were just 'straw persons'* for purposes of the licenses," *id.* at 736 (emphasis added). As the trial court accurately noted, however, a person cannot "have a vested interest in property if he is found to be acting as a nominee for persons whose property is subject to forfeiture."[71] *Id.* at 738. Which is it, then? Did Michael Gilbert own a forfeitable interest in the Club, or was he a nominee, or "straw man," holding Kramer's LCP, Ltd. interest? Because these questions have never been answered, it is unclear whether even the district court knows the origin of the Gilbert interests.

The Government, therefore, seeks to use the section 1963(*l*) ancillary proceeding as a quiet title suit, in which the Gilberts and the Trust would bear the burden of proving the origin and legitimate ownership of their interests in LCP, Ltd. 18 U.S.C. § 1963(*l*)(6) (stating that the petitioner must establish legitimate ownership by a preponderance of the evidence). The district court foreshadowed the result of such a proceeding in its Amended Final Order, in which it stated that Michael Gilbert was "involved heavily, or knew or should have known of the illicit nature of the operation," *Kramer,* 807 F.Supp. at 736, and that Mrs. Gilbert "knew, or at least should have known[,] of the tainted nature of her husband's interest," *id.* at 741. Moreover, it found that "even if the trust was a bona fide purchaser for value, ... [the] co-trustee ... obviously had strong cause to believe the Club was funded, at least in part, by laundered drug money and [was] thus forfeitable." *Id.* at 742. Since most of the heavy lifting has already been done, the hardest part of the Government's case is haling the Gilberts and the Trust into court. But, as we have established, this it cannot do.

4.

In sum, the circumstances make clear why the Government would like the Gilberts to file section 1963(*l*) petitions in this case. Waiting out the clock could only finalize the Government's title to an *unspecified* interest in LCP, Ltd., an interest which has practically no market value. The Government now seeks to institute proceedings that it believes will guarantee a judgment for a *specified* amount of LCP, Ltd.—a judgment it can "take to the bank." Additionally, a section 1963(*l*) proceeding would determine the origin of the Gilbert interests and finally allow the Government to clear the chain of title and sell its interest.

---

[71]Nominee "connotes the delegation of authority to the nominee in a representative or nominal capacity only, and does not connote the transfer or assignment to the nominee of any property in, or ownership of, the rights of the person nominating him." *Braxton v. United States,* 858 F.2d 650, 653 n. 6 (11th Cir.1988).

While the Government's approach is an innovative one, it cannot succeed. For the reasons stated *supra,* Part III.A., section 1963(*l* ) does not provide the Government an implied cause of action to force the Gilberts to file section 1963(*l* ) petitions. Thus, the Government's only recourse in its attempt to recapture those interests that the Gilberts and the Trust may have derived from Benjamin Kramer is to institute a separate quiet title action in California.[72]

IV.

Even if section 1963(*l* ) could be interpreted to provide an implied cause of action in favor of the Government, the court could not grant the requested injunction in this case because the Government holds nothing for the Gilberts to claim. The Government's argument on appeal is based entirely on the assumption that it holds a valid order of forfeiture against Benjamin Kramer. This assumption, however, is wrong for several reasons. First, the jury's verdict and the district court's subsequent order of forfeiture constituted an improper attempt to effect an *in rem,* rather than an *in personam,* forfeiture. The former type of forfeiture is a remedial action against property, whereas the latter is a punitive action against a defendant. Second, the evidence at trial conclusively established that Benjamin Kramer did not own what the jury attempted to forfeit by its verdict—the Bell Gardens Bicycle Club. Kramer actually stood once removed from the real estate—owning only an *interest in a limited partnership* (LCP, Ltd.) that owned part of the Club through its joint venture agreement with PPA. Third, even if the jury's verdict were construed to have forfeited Kramer's interest in LCP, Ltd. rather than the Club itself, the verdict was deficient insofar as it failed to specify the percentage of Kramer's ownership interest in LCP, Ltd. Without a judgment for a specified interest, the Government cannot establish how much of the defendant's property was forfeited. Fourth, even if the

---

[72]A quiet title action is usually defined as a "proceeding to establish the plaintiff's title to *land* by bringing into court an adverse claimant and there compelling him either to establish his claim or be forever estopped from asserting it." *Black's Law Dictionary* 1249 (6th ed.1990) (emphasis added). Under current California law, however, "title to both real and personal property may be litigated in a quiet title action." *Lopes v. Lopes,* 152 Cal.App.3d 302, 199 Cal.Rptr. 425, 429 (1984); *see also* Cal.Civ.Proc.Code § 760.020 (stating that "[a]n action may be brought under [the quiet title] chapter to establish title against adverse claims to real or personal property or any interest therein"). California law holds that "a partner's interest in partnership property of whatever character (realty or personalty) is an interest in personalty for all purposes." *Tinseltown Video, Inc. v. Transportation Ins. Co.,* 61 Cal.App.4th 184, 71 Cal.Rptr.2d 371, 373 (1998).

Notably, the Government will bear the burden in the quiet title proceeding of proving that it has a superior claim to the property at issue. *See* Cal.Code § 637 ("The things which a person possesses are presumed to be owned by him."); *Davis v. Crump* 162 Cal. 513, 123 P. 294, 296-97 (1912) ("Proof of possession makes a prima facie case of ownership as against one not shown to have had any title or possession.").

forfeiture verdict had been in flawless form—targeting Kramer's interest in LCP, Ltd. and specifying his percentage of ownership—the district court neither entered the verdict nor ordered forfeiture as part of Kramer's sentence. In other words, the district court allowed the forfeiture verdict to vanish, without any force or effect. As a result, the event triggering ancillary proceedings and seizure of the property never occurred. Thus, the district court properly denied the Government's request for a mandatory injunction. The Gilberts cannot be forced to claim an interest in property the Government does not have, or be forced to file petitions in a proceeding not authorized by law.

A.

1.

The distinction between *in rem* forfeiture (civil) and *in personam* forfeiture (criminal) is of great import in this case, and has an illustrative history:

> The law of forfeiture dates back to the Old Testament. According to *Exodus* 21:28 (King James), "If an ox gore a man or a woman, and they die: then the ox shall be surely stoned, and his flesh shall not be eaten." A suggested basis for the text is that if the ox offended the heirarchical [sic] order, appeasement of God, the sovereign, required reparation which could only be attained by the ox forfeiting its life. *See* Finkelstein, *The Goring Ox: Some Historical Perspectives on Deodands, Forfeitures, Wrongful Death and the Western Notion of Sovereignty,* 46 TEMP. L.Q. 169, 180 (1973). The forfeiture doctrine continued into the common law of England where the Crown became the sovereign to be appeased. Thus, if an object such as a cart, tree, or well took the life of a King's subject, the object became the Crown's in order to redress the loss of human life and provide revenue. *See Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 681, 94 S.Ct. 2080, 2090, 40 L.Ed.2d 452 (1974) (citing O. Holmes, *The Common Law,* c 1 (1881)).

> Forfeiture survived the journey into American law, although not without criticism. *Cf. Calero-Toledo,* 416 U.S. at 689, n. 27, 94 S.Ct. at 2095, n. 27; *United States v. U.S. Coin and Currency,* 401 U.S. 715, 719-20, 91 S.Ct. 1041, 1043-44, 28 L.Ed.2d 434 (1971); *United States v. One 1976 Mercedes Benz 280S,* 618 F.2d 453, 461 (7th Cir.1980) (forfeiture in present law constitutes vestiges of "old, forgotten, far-off things and battles long ago")....

> The classical distinction between civil and criminal forfeiture was founded upon whether the penalty assessed was against the person or against the thing. Forfeiture against the person operated *in personam* and required a conviction before the property could be wrested from the defendant. *See Calero-Toledo,* 416 U.S. at 682, 94 S.Ct. at 2091; *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965). Such forfeitures were regarded as criminal in nature because they were penal; they primarily sought to punish. Forfeiture against the thing was *in rem* and the forfeiture was based upon the unlawful use of the *res,* irrespective of its owner's culpability. These forfeitures were regarded as civil; their purpose was remedial. *Calero-Toledo,* 416 U.S. at 680-81, 94 S.Ct. at 2090; *U.S. Coin & Currency,* 401 U.S. at 719, 91 S.Ct. at 1043.

*United States v. Seifuddin,* 820 F.2d 1074, 1076-77 (9th Cir.1987).

Criminal forfeiture under RICO is *in personam. United States v. Bissell,* 866 F.2d 1343, 1348 n. 3 (11th Cir.1989). In other words, it is a form of punishment imposed by the jury to divest the criminal defendant of the profits of the illegal activity for which he has been convicted. *Id.; United States v. Conner,*

752 F.2d 566, 576 (11th Cir.1985); *see also* 18 U.S.C. § 1963(e); Fed.R.Crim.P. 32(d)(2). RICO's forfeiture penalty works to strip a convicted racketeer of all the fruits and tools of his racketeering in an effort to strike at the heart of the illegal enterprise. By providing a method by which to confiscate tainted property and proceeds, Congress aimed to put criminal enterprises out of business. *Russello v. United States,* 464 U.S. 16, 26-27, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983). Forfeiture is imposed as punishment in addition to any term of imprisonment and/or fine the convicted racketeer may receive. *See* 18 U.S.C. §§ 3554, 1963(a); *Libretti v. United States,* 516 U.S. 29, 38-39, 116 S.Ct. 356, 363, 133 L.Ed.2d 271 (1995) ("Forfeiture is an element of the sentence imposed *following* conviction or ... a plea of guilty....").

Because it seeks to penalize the defendant for his illegal activities, *in personam* forfeiture reaches only that property, or portion thereof, owned by the defendant. *United States v. Peters,* 777 F.2d 1294, 1296 (7th Cir.1985) ("An examination of the forfeiture provision reveals that Congress clearly intended that the government acquire only that interest which the criminal defendant held in the property."); S.Rep. No. 98-225, at 207-08, reprinted in 1984 U.S.C.C.A.N. 3182, 3391 ("Criminal forfeiture is an *in personam* proceeding. Thus, an order of forfeiture may reach only property of the defendant, save in those instances where a transfer to a third party is voidable."). Stated another way, the property itself is not forfeited; rather, the defendant's *interest* in the property is forfeited. If criminal forfeiture reached beyond that portion of the property that was owned by a defendant, such a form of forfeiture would be *in rem,* against the property, rather than *in personam,* against the defendant. *See United States v. Kennedy,* 201 F.3d 1324, 1329 (11th Cir.2000).

That criminal forfeiture can only reach a defendant's interest in the subject property makes sense. In the case of criminal forfeiture, the district court has "jurisdiction to enter orders ... without regard to the location of any property which may be subject to forfeiture ... or which has been ordered forfeited." 18 U.S.C. § 1963(j). The district court's power to enter orders relating to property outside the court's jurisdiction derives from its personal jurisdiction over the defendant. Because the defendant is before the court, the court has the power to adjudicate *his* ownership interest in property, by virtue of the criminal charges against him. Forfeiture of the convicted defendant's interest in illicitly obtained property appropriately punishes the defendant by separating him from his racketeering gains while leaving undisturbed the interests of innocent third parties who are beyond the court's jurisdiction. For this jurisdictional reason, an order of forfeiture imposed upon a defendant as a penalty for his wrongdoing "determine[s] the government's title in property

only as against the named defendants, while civil forfeiture actions [which are brought in the jurisdiction where the *res* is located] are *in rem* and determine the government's title in property as against the whole world." *United States v. Tit's Cocktail Lounge,* 873 F.2d 141, 143 (7th Cir.1989).

2.

The Government in this case sought forfeiture of the Club under 18 U.S.C. § 1963(a)(3) as "property constituting, or derived from ... proceeds which the [convicted racketeers] obtained, directly or indirectly, from racketeering activity." Specifically, the Government argued to the jury in its closing argument that "as soon as they started to build the Bell Gardens Bicycle Club, under Federal law, that property became forfeitable to the United States.... The reason for this ... is because what was used to build the [Club], that twelve and a half million dollars, came from proceeds of marijuana trafficking, and from that point forward, that property was subject to forfeiture."

Section 1963(a)(3) and the principle of *in personam* forfeiture, however, dictate that the jury could forfeit only that portion of the Club owned by the convicted racketeers. The district court acknowledged as much in its Amended Final Order following the ancillary proceedings, in which it stated that "[i]f [the forfeiture] were *in rem,* then the verdict would reach the entire property. However, the only property forfeitable at this time is that which belonged to the criminal defendants in this case whose interest in the Bell Gardens Bicycle Club ... the jury forfeited under [section] 1963(a)(3)." *Kramer,* 807 F.Supp. at 737. Forfeiture of the *entire* Club, then, would have been appropriate only if the jury found that one or more defendants were the exclusive owners of the Club. *Cf. United States v. Busher,* 817 F.2d 1409, 1413 n. 7 (9th Cir.1987) ("The problem of forfeiture of an entire enterprise is essentially limited to the situation where the convicted defendant owns substantially all of the stock of a corporation, or where the enterprise is a sole proprietorship. This is so because under section 1963 only the *defendant's interest* in the enterprise is forfeitable, not the enterprise itself.... Thus, only where the culpable person owns the entire enterprise will it be subject to complete forfeiture for violation of RICO.").

The jury knew that the three defendants were *not* the exclusive owners of the Club; they had seen ample evidence showing that PPA—an innocent party—held an interest in the Club. They were reminded of that fact by the Government during its closing argument, when it attempted to assuage the jury's fears about forfeiting property belonging, in part, to innocent owners:

> Now, during your deliberations, you ought not to be concerned with, well, what about the innocent people here? What about Park Place Associates? What about Sanwa Bank[,] where there is a

legitimate loan. [T]hose individuals can petition the court to get back any interest that they have, or to preserve and protect any interest that they have in the [Club], or any loans that are outstanding.

Thus, the jury clearly understood that it was being asked to forfeit property beyond that owned by the defendants.

Despite the evidence showing that the defendants were not the exclusive owners of the Club, the jury was never asked whether only *part* of the Club was subject to forfeiture. Rather, the jury was limited to an all-or-nothing decision.[73] In accordance with the Government's request, the forfeiture verdicts returned against Benjamin Kramer, Jack Kramer, and Michael Gilbert purported to forfeit the *entire* Club—"the ongoing business, premises and building, together with fixtures."

The jury, however, could not legally order the forfeiture of the entire Club. While the defendants' tainted *interests* in the business were subject to forfeiture, the poorly drafted verdict forms did not give the jury the opportunity to limit the forfeiture to those interests. The end result was a verdict of forfeiture that purported to forfeit the Club in its entirety, even though the evidence clearly established that the three defendants did not own the entire Club.

As a result of the jury's overbroad pronouncement, the Bell Gardens Bicycle Club—a business with an approximate value of $150 million in 1990—became the centerpiece of an order of forfeiture entered by the district court on April 3, 1990, immediately after the jury returned the last forfeiture verdict. In accordance with the verdict, the court ordered that "the ongoing business, premises and building, together with fixtures, ... known as the Bell Gardens Bicycle Club be and hereby are forfeited to the United States of America for its full use and benefit, pursuant to 18 U.S.C. § 1963(a)(3)," and further ordered that the United States "immediately seize the physical premises of the Club."

Despite the *in personam* limitations of criminal forfeiture proceedings, the district court's order erroneously conflated the concepts of *in personam* and *in rem* forfeiture by professing to give the Government a piece of real estate and an ongoing business in California, as opposed to the defendants' limited ownership interest in the business. At least one commentator was puzzled by this result, and admitted being unable to "explain how the jury could find that the entire Club was subject to forfeiture as racketeering proceeds under section 1963(a)(3) when only a part of the financing of the Club came from drug money." 2 David B. Smith,

---

[73]The special verdict forms asked whether the Club "constituted or was derived from any proceeds which [the defendant] obtained directly or indirectly from racketeering activity." If the jury answered in the affirmative, the only remaining question regarding the Club was whether "the Bell Gardens Bicycle Club [was] subject to forfeiture."

*Prosecution and Defense of Forfeiture Cases* ¶ 14.08 n. 37 (2000).[74]

The trial court sought to correct its mistake in its Amended Final Order following the ancillary proceedings, in which it described the jury verdict as "forfeiting *the interests* of Ben Kramer, Jack Kramer and Michael Gilbert in the Bicycle Club," and stating that "[o]nly *the interests* of [the] three convicted defendants in the Bicycle Club were forfeited." *Kramer,* 807 F.Supp. at 709-10 (emphasis added). This complete re-characterization of the court's initial *in rem* order of forfeiture, however, came too late. Since the jury's verdict reached beyond those assets that were legally forfeitable under the applicable statute, the verdict was invalid. Without a valid *verdict* of forfeiture, the district court cannot properly enter an *order* of forfeiture unless the defendant waives his right to a jury trial on that issue. *See United States v. Bornfield,* 145 F.3d 1123, 1138-39 (10th Cir.1998). No such waiver was made in this case. Thus, the Government actually holds nothing by virtue of the forfeiture order against Benjamin Kramer.

B.

In addition to its vagueness and overbreadth, the verdict of forfeiture against Benjamin Kramer was improper on a more fundamental level. Benjamin Kramer never owned any part of the Club. The Club itself was a joint venture between two partnerships: PPA and LCP. Thus, the Joint Venture was the club's true owner. *See Barr Lumber Co., Inc. v. Old Ivy Homebuilders, Inc.,* 34 Cal.App.4th Supp. 1, 40 Cal.Rptr.2d 717, 720 (1995) (holding that an individual partner is not deemed the owner of specific partnership assets by virtue of his status as partner; property of the partnership belongs to the partnership, not the partner).

The fact that the Joint Venture, and not Benjamin Kramer, owned the Club was conclusively established at trial. The jury saw the Joint Venture Agreement between PPA and the LCP general partnership, which stated clearly that PPA and LCP had associated to form the Joint Venture known as the Bell Gardens Bicycle Club. Further, the purpose of the Joint Venture set forth in the agreement was "to organize, *own,* and

---

[74]During the ancillary proceedings, counsel for Julie Coyne, Richard Kirschner, advanced an illustrative hypothetical:

> If you take the Government's reasoning to its logical conclusion ... you can have a convicted felon who bought a hundred shares of General Motors, and he used drug proceeds, and you have a hundred thousand other shareholders in General Motors, all of the shareholders['], including the drug dealer's money, are used to develop General Motors[.] [I]f you follow the Government's reasoning and theory, all of General Motors is forfeited to the Government, all of the dividends are suspended, and it's up to the other 99,000 shareholders to prove their interest in an ancillary hearing, because the money got commingled, and it was used to develop General Motors. Just not the law. Just doesn't happen.

operate the Bell Gardens Bicycle Club ... and to ... *own* the real property on which said card club is to be operated" (emphasis added). The jury also saw the loan agreement between CGL and the Club, in which the Bell Gardens Bicycle Club was described as "a Joint Venture consisting of [PPA], a California Limited Partnership ... and [LCP], a California General Partnership" and was referred to as "Owner" throughout. Finally, the jury saw the Deed of Trust executed by the Bell Gardens Bicycle Club in favor of CGL, wherein the Club was named as the owner of the parcels of land on which the card club was built.

At most, then, what Benjamin Kramer owned was a silent partnership interest in LCP general partnership, which later became LCP, Ltd. Thus, it was Benjamin Kramer's silent interest in LCP, Ltd. that should have been targeted for forfeiture in the indictment, jury instructions, and special verdict forms, not the Bell Gardens Bicycle Club.[75] Unfortunately for the Government, this was only made clear during the ancillary proceedings. Because the jury—and the district court, by its initial order of forfeiture—forfeited property that Kramer did not own, the Government holds nothing by virtue of the order of forfeiture against Benjamin Kramer.[76]

C.

Even if the forfeiture proceedings had properly targeted Kramer's interest in LCP, Ltd., rather than the Club, the jury's verdict would remain fatally deficient. "Rule 31(e) of the Federal Rules of Criminal Procedure provides for the procedural implementation of the RICO criminal forfeiture provision ... and requires a special verdict." *United States v. Amend,* 791 F.2d 1120, 1128 (4th Cir.1986). By its terms, Rule 31(e) calls for the special verdict to set forth "the extent of the interest or property subject to forfeiture, if

---

[75]As an alternative to forfeiting Benjamin Kramer's silent partnership interest in LCP, Ltd., the Government could have sought forfeiture of, as proceeds of racketeering, Benjamin Kramer's share of the tainted money used to build the Club, his share of the fifteen percent interest rate paid by the Joint Venture in the CGL mortgage, and his share of the fifteen percent income participation kicker. Of course, under any of these bases of forfeiture, the Government's recovery would have been limited to Benjamin Kramer's share of the drug proceeds since the Government elected not to indict Benjamin Kramer's drug-trafficking partners. In any event, it is beyond doubt that Kramer had no ownership interest in the Club for the jury to forfeit.

[76]In the district court's Amended Final Order following the ancillary proceedings, the court attempted to shift the focus of forfeiture from the Club to LCP, Ltd. The court could not have ordered forfeiture of LCP, Ltd. at any time during the proceedings, however, because Federal Rule of Criminal Procedure 7(c)(2) provides that "[n]o judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information shall allege the extent of the interest or property subject to forfeiture." The grand jury's indictment alleged that *the Club,* rather than LCP, Ltd., was subject to forfeiture in the instant case. Despite the flaws inherent in such an allegation, the court was prohibited by Rule 7(c)(2) from correcting the grand jury's mistakes on its own initiative. Rather, the court could only order forfeiture of that interest or property named in the indictment, to wit: the Bell Gardens Bicycle Club.

any." Fed.R.Crim.P. 31(e).

Quite simply, there was nothing special about the special verdict of forfeiture forms submitted to the jury. The forms, essentially identical as to each defendant, merely asked whether the Club "constituted or was derived from any proceeds which Benjamin Kramer obtained directly or indirectly from racketeering activity." If the jury answered in the affirmative, the only remaining question regarding the Club was whether "the Bell Gardens Bicycle Club [was] subject to forfeiture."

During the ancillary proceedings, petitioner Julie Coyne's counsel, Richard Kirschner, pointed out that "only a convicted defendant's interest in a club is forfeited or an asset is forfeited, not every other interest in the world. And that's the problem. This jury didn't come back and say what interest the Kramers held in the club." The court replied that "[t]hey didn't have any evidence on that. They weren't asked to do that." Indeed, the verdict forms asked neither what percentage of ownership each defendant held in the subject property nor how much of that interest was subject to forfeiture. As discussed *supra,* Part III.B., the effect of this deficiency, when read in the light most favorable to the Government, was to assign the Government an unspecified, and therefore worthless, interest in LCP, Ltd.[77]

D.

Finally, even if the special verdict of forfeiture had been in proper form, title to Kramer's property never vested in the Government. On August 29, 1990, the district court sentenced Benjamin Kramer to a "TOTAL sentence" of "FORTY FIVE years confinement.... Commited [sic] fines of $460,000.00 ... [and a] $1,000.00 assessment." The court made no mention of forfeiture, apparently relying on its April 3 order[78] as the final disposition of that issue. The court could not have ordered forfeiture of Kramer's property on April 3, however, because criminal forfeiture "may not take place until a judgment of conviction is entered and sentence imposed." *United States v. Alexander,* 772 F.Supp. 440, 440 (D.Minn.1990). Because the court failed to properly enter an order of forfeiture, the Government never obtained the right to seize Kramer's

---

[77]Coyne's counsel stated at the outset of the ancillary proceedings that "[The Government] said, Fellas, we own the Bicycle Club. Our response to them has been, Fellas, you may own the Kramer interest in the Bicycle Club, and you may own Michael Gilbert's interest in the Bicycle Club, [but] you sure as heck don't own the whole Bicycle Club, because the jury did not come back with an indication of what percentage the Kramers or Michael Gilbert owned. You say you own a hundred percent of it, we say you own zero."

[78]On April 3, 1990, immediately after the final forfeiture verdict was returned, the court "entered the government's proposed order for forfeiture, and also seized the Club in its entirety, appointed an interim trustee, and prevented the Club or its owners from distributing profits or transferring their interests." *Kramer,* 912 F.2d at 1259.

property. Additionally, the condition precedent to the start of ancillary proceedings under 1963(*l*)—an "order of forfeiture"—never occurred. Thus, the district court properly denied the Government's request for a mandatory injunction.

1.

It is beyond doubt that criminal forfeiture is part of a defendant's sentence. 18 U.S.C. §§ 1963(a), 3554; *United States v. Bissell,* 866 F.2d 1343, 1349 n. 3 (11th Cir.1989) ("[C]riminal forfeiture operates *in personam* against the defendant, serving as a penalty upon conviction."); *United States v. Derman,* 211 F.3d 175, 182 (1st Cir.2000) ("[T]he forfeiture order ... is a part of the sentence, and becomes final for purposes of appeal when the court issues its judgment.") (citation omitted). In fact, forfeiture is a *mandatory* element of sentencing for a violation of 18 U.S.C. § 1962. *United States v. L'Hoste,* 609 F.2d 796, 809-13 (5th Cir.1980). As such, it must be ordered at a hearing that affords the defendant his right of allocution.[79] In the instant case, however, the court entered the order of forfeiture at an "impromptu hearing" immediately following the verdicts. *Kramer,* 912 F.2d at 1259. Indeed, neither Benjamin Kramer nor his attorney were even present in the courtroom when the order was entered. As such, the court could not, as required by Federal Rule of Criminal Procedure 32(a)(1),

> (A) determine that the defendant and defendant's counsel have had the opportunity to read and discuss the presentence investigation report[;]
>
> (B) afford counsel for the defendant an opportunity to speak on behalf of the defendant;  and
>
> (C) address the defendant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence.

Fed.R.Crim.P. 32(a)(1)(A)-(C) (1990) (current version at Fed.R.Crim.P. 32(c)(3)(A)-(E)). As Kramer was not afforded an opportunity to allocute on April 3, the purported order of forfeiture entered on that date could not have been part of his sentence.

---

[79]Black's Law Dictionary defines "allocution" as:

> 1. A trial judge's formal address to a convicted defendant, asking him or her to speak in mitigation of the sentence to be imposed. This address is required under Fed.R.Crim.P. 32(c)(3)(C).
>
> 2. An unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. This statement is not subject to cross-examination.

Black's Law Dictionary 75 (7th ed.1999).

Moreover, it is clear that the trial court did not intend the impromptu gathering to function as a sentencing hearing. Counsel for David Pierson—a third party claimant—called the court's attention to the fact that "the Government seeks a final judgment of forfeiture, notwithstanding the fact that Rule 32(b) provides that forfeiture orders don't occur until sentencing. We are not at sentencing today. We are not anywhere close; yet they're seeking a final order of forfeiture." Indeed, the most the court could have done on April 3 was issue temporary restraints to maintain the status quo of the property. *See* 18 U.S.C. § 1963(d).[80] The prosecution erroneously replied, however, that the court need not wait until sentencing to enter the order of forfeiture, for 18 U.S.C. § 1963(e) mandates that an order of forfeiture be entered "upon conviction," and all of the defendants in the case had been "convicted" within the meaning of the statute. While referring the district court to our opinion in *L'Hoste* for the proposition that forfeiture is mandatory, the prosecution failed to point out that *L'Hoste* also held that forfeiture should be ordered *as part of a defendant's sentence*. *L'Hoste,* 609 F.2d at 812-13. Unfortunately, the court adopted the prosecution's argument and entered the forfeiture order on April 3. In so doing, the court implicitly agreed that the order of forfeiture need not be—and was not—part of Kramer's sentence.[81]

2.

Because the April 3 order was not part of Kramer's sentence, it did not forfeit his property to the

---

[80]18 U.S.C. § 1963(d)(1) (1994) provides:

> Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property described in subsection (a) for forfeiture under this section—
>
> > (A) upon the filing of an indictment or information charging a violation of section 1962 of this chapter and alleging that the property with respect to which the order is sought would, in the event of a conviction, be subject to forfeiture under this section.

> The court's judgment on August 29—containing no order of forfeiture—superseded the April 3 order, terminated any temporary restraints on the property, and ended the case. *See United States v. Gelb,* 826 F.2d 1175, 1176 (2d Cir.1987) ("Congress appears to have provided no durational limitation to [post-indictment restraining orders] ... short of the termination of the related criminal prosecution.").

[81]Because forfeiture is a mandatory element of any sentence under 18 U.S.C. § 1963(a), *L'Hoste,* 609 F.2d at 809-13, Kramer's sentence "was imposed in violation of law." 18 U.S.C. § 3742(b)(1). The Government's remedy was an appeal to this court within 30 days from the entry of judgment or notice of appeal by any defendant. Fed. R.App. P. 4(b) (1990) (current version at Fed. R.App. P. 4(b)(1)(B)). The Government took no such appeal. Thus, although the court clearly erred, the Government has waived the error and the sentence is final.

Government.  The premature order was merely an invalid attempt to bypass the procedurally required method of criminal forfeiture set forth in Federal Rule of Criminal Procedure 32(b).[82]  Until its amendment in 1996, Rule 32(b) read as follows:

> (b) Judgment.
>
>> (1) In General.  A judgment of conviction shall set forth the plea, the verdict or findings, and the adjudication and sentence....
>
>> (2) Criminal Forfeiture.  When a verdict contains a finding of property subject to a criminal forfeiture, the *judgment of criminal forfeiture* shall authorize the Attorney General to seize the interest or property subject to forfeiture....

Fed.R.Crim.P. 32(b) (1990) (emphasis added) (current version at Fed.R.Crim.P. 32(d) (1994)).[83]  While subsection (b)(2) includes the terms "verdict" and "judgment," it states that only a "*judgment* " of criminal forfeiture shall authorize the Attorney General to seize the defendant's property.  Subsection (b)(1) requires that a "judgment ... set forth the ... *sentence.*"  Because it must set forth the terms of the defendant's sentence, the "judgment" in subsection (b)(2) authorizing the Attorney General to seize the defendant's property could not be entered at any time prior to sentencing.  *See United States v. Ripinsky,* 20 F.3d 359, 362 (9th Cir.1994) (holding that until a judgment of conviction was entered at sentencing, the sole legal basis for continuing to restrain forfeitable assets was a pretrial restraining order); *Alexander,* 772 F.Supp. at 441 (stating that Rule 32(b) "contemplate[s] an order of forfeiture at the time of sentencing").[84]  Thus, the trial court's order of forfeiture entered on April 3—nearly five months before Kramer's sentencing—was not a "judgment"

---

[82]Rule 32(b) was promulgated "to provide procedural implementation of the ... criminal forfeiture provisions of ... § 1963."  Fed.R.Crim.P. 32(b) advisory committee notes on 1972 amendments.  Specifically, Rule 32(b) was intended to be read in conjunction with 18 U.S.C. § 1963(c) (amended before the time of trial to section 1963(e)), which provided for seizure and disposition of criminally forfeited property.  *Id.* At the time of trial, section 1963(e) stated that "[u]pon conviction of a person under this section, the court shall authorize the Attorney General to seize all property or other interest declared forfeited under this section upon such terms and conditions as the court shall deem proper."  18 U.S.C. § 1963(e) (1990).

[83]Rule 32(b) was amended in 1996 to allow the court to issue a "preliminary order of forfeiture" before sentencing.  The purpose of the order is merely to protect the forfeitable property between verdict and sentencing, much like a pre-1996 restraining order.  The preliminary order, however, is not final as to the defendant and thus not appealable.  "[B]oth before and after the 1996 amendments the key moment for determining finality for the purpose of appeal is sentencing."  *United States v. Derman,* 211 F.3d 175, 182 n. 9 (1st Cir.2000).

[84]The court also noted in *Alexander* that "review of RICO convictions reveals the general practice is, in fact, imposition of forfeiture at the time of sentencing."  *Id.* at 442 (collecting cases).

authorizing the Government to seize Kramer's property.[85]

Similarly, the court's April 3 order was not the "order of forfeiture" required to begin ancillary proceedings under 18 U.S.C. § 1963(*l* )(1).  Although one may argue that the "order" required by 1963(*l* ) may precede the "judgment" entered at sentencing under Rule 32(b)(2), such an argument would be wholly unpersuasive.  First, the terms "judgment" and "order" appear to be used interchangeably throughout section 1963.  Subsection (a), for instance, provides that "[t]he court, in imposing sentence ... shall *order* " forfeiture, while subsection (e) states that "upon conviction ... the court shall enter a *judgment* of forfeiture."  Both subsections anticipate that forfeiture will occur at sentencing.

Moreover, section 1963(*l* ) ancillary proceedings are held so that innocent third-party owners can get their interests *back* from the government.  This presupposes that the government has something for third-parties to claim.  In other words, ancillary proceedings—which are activated under 1963(*l* ) by an *order* of forfeiture—could not take place without the government's seizure of the property, which is authorized under 1963(e) and Rule 32(b)(2) by a *judgment* of forfeiture.  *See United States v. Ginsburg,* 773 F.2d 798, 801 (7th Cir.1985) ("[T]he government's interest in property subject to criminal forfeiture does not attach until the defendant is convicted of the crime for which the forfeiture is imposed.").  Thus, even if the terms have different meanings, it is clear from the forfeiture scheme that the judgment, rather than the order, must come first.  As noted above, the judgment may not be entered until sentencing.  Since it cannot logically precede the judgment, the "order of forfeiture" required by section 1963(*l* ) also may not be entered until sentencing.  Therefore, the order of forfeiture entered by the court on April 3—nearly five months before sentencing—was not sufficient to trigger the start of ancillary proceedings pursuant to 1963(*l* ).  Because the district court could not order the Gilberts to file petitions in a nonexistent proceeding, it properly denied the Government's request for a mandatory injunction.

## V.

For the reasons herein stated, the judgment of the district court is

---

[85]The law of the case doctrine, *see supra* note 51, is no impediment to our statement that there was no valid judgment of forfeiture against Benjamin Kramer.  The 1990 expedited appeal generated a memorandum opinion, in which the court stated that "[b]ecause no hearing has been conducted, the facts recited by the court are taken from the briefs and do not represent opinions of the court." *Kramer,* 912 F.2d at 1258.  Thus, the panel's characterization of the April 3 order as an order of forfeiture is merely a misrepresentation by the parties in their briefs.  As for the 1996 opinion, the panel did not consider the forfeiture issue as to Kramer because Kramer did not challenge the forfeiture verdict the jury returned against him. *Kramer,* 73 F.3d at 1070.

AFFIRMED.

EDMONDSON, Circuit Judge, concurs in judgment only.